Filed 9/28/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>KAM HING WONG,<br><br>    Defendant and Appellant. | B283174<br><br>(Los Angeles County<br>Super. Ct. No. GA098540) |

        APPEAL from a judgment of the Superior Court of Los Angeles County.  Curtis A. Kin, Judge.  Affirmed as modified.

        Thomas Owen, under appointment by the Court of Appeal, for Defendant and Appellant.

        Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr. and Daniel C. Chang, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Kam Hing Wong appeals from a judgment which sentences him to a life sentence for the attempted murder of his wife, Mei O.[1]  Wong challenges his sentence on appeal, contending the trial court erred when it imposed to a single count three consecutive one-year enhancements for the use of deadly weapons.  We agree Penal Code section 654[2] prohibits multiple punishment under these circumstances.  We affirm the judgment but modify the sentence to stay the imposition of two of the three deadly weapon enhancements.

**FACTS**

*The Attempted Murder*

Mei and Wong met in China in October 2013 after Mei posted a personal ad in a Chinese-language newspaper.  They married one month later.  At the time, Mei lived in China and Wong lived in the United States.  They spent the first two and a half years of their marriage apart, waiting for her visa to be granted.  They spoke every day on the phone, however, and Wong visited Mei in September 2014.

Mei arrived in Los Angeles on March 30, 2016, soon after her visa was granted.  The next afternoon, Wong asked her to cut his hair and brought out two pairs of scissors for her to use.  Mei cut his hair and then continued to clean the house and perform other chores.  After dinner, Mei and Wong had sex.  Mei then went to take a shower.

---

[1]	To protect personal privacy interests as required under rule 8.90 of the California Rules of Court, we will refer to the victim and witnesses in this matter by their first name and last initial.

[2]	All further section references are to the Penal Code unless otherwise specified.

2

Mei was washing her hair when she heard a bang and felt something strike her head. She initially believed the shower head had fallen on her. She soon realized Wong was stabbing her with the two pairs of scissors she had used to cut his hair. Mei fought back and asked why he was doing this. He replied that he wanted her to die. Mei fought with him and ran through the house to the front door. She felt Wong stab her in the back and shoulders multiple times as she tried to unlock the door. They were both struggling on the ground, which was wet with her blood, and Mei became dizzy from blood loss. She finally managed to take the scissors away from him and throw them behind the sofa.

She then saw Wong procure a 12-inch long knife, which he used to cut her from her kneecap to her shin. She wrested the knife away from him and threw it behind the sofa as well. With great difficulty, Mei managed to get up and run out the back door, which was unlocked. As she opened the back door, she felt something cut the back of her hip.

Once outside, Mei flagged down Lillian R.'s car. Lillian's mother was driving when they saw a nude person run out into the middle of the street, covered in blood. Lillian called 911.

Mei was transported to a nearby hospital, where she stayed for six days and was treated for 32 puncture wounds, not including superficial abrasions, and received over 100 stitches. The emergency room doctor noted multiple lacerations to her neck, head, chest, back, and abdomen. Because she was bleeding profusely from injuries to her head, the doctor closed the wounds on her scalp with staples to prevent a drop in blood pressure and damage to vital organs resulting from blood loss.

A search of Wong's house revealed a meat cleaver with what appeared to be blood on the handle and the blade as well as a small knife with a red substance on its handle. The police observed blood all over the wooden floors in the living room and on the walls near the front door as well as in the bedroom and bathroom. Two pairs of scissors and a 12-inch long knife were found underneath the couch. They appeared wet with blood. There was a trail of blood leading from the back door to the intersection where Mei was discovered.

Wong was arrested and confessed after waiving his *Miranda*[3] rights. Wong admitted to trying to kill Mei because he suspected she was having an affair. In addition, he blamed her for his older son moving in with his girlfriend, and he believed he would lose his house as a result of the application for her visa.

*The Trial*

Wong was charged with attempted, willful, deliberate, and premeditated murder. (§§ 664/187, subd. (a).) It was further alleged that in the commission and attempted commission of this offense, he personally used three deadly and dangerous weapons, scissors, a butcher knife, and a knife (§ 12022, subd. (b)(1)), and that he personally inflicted great bodily injury upon the victim (§ 12022.7, subd. (e)).

At trial, the People presented testimony from Mei and other witnesses regarding the events as described above. Wong testified he lost control because he believed Mei was cheating on him. He explained that Chinese tradition dictated the bedding on a wedding night should be red in color, signifying a festive and happy event. On their wedding night in China, however, Mei used green pillow covers with a note inside stating, "at home

---

[3] *Miranda v. Arizona* (1966) 384 U.S. 436.

there is a well-mannered wife." He believed the green color of the pillowcase was tantamount to giving him a green hat to wear. In Chinese folklore, a man who wore a green hat was being cuckolded by his wife. He did not mention this suspicion to her at the time.

When Wong visited Mei again in 2014, she used an even bigger green towel for his pillowcase. He did not confront her about it while he was in China, because he did not want to argue with her. However, he did ask her about it when they spoke over the phone after he returned to the United States. He told her that "every Chinese knows that when you use a green towel as a pillow it means that you're giving the green hat to the husband to wear." Although she understood the significance of it, she denied having an affair, and responded, "even if you point me with a gun then I would not admit to it."

Wong testified he was not happy when Mei arrived in Los Angeles, but he welcomed her anyway. He explained he "lost control" after he found two green-colored towels in his clothes as he was preparing to take his shower. He immediately felt dizzy and really angry, because he viewed those towels as proof that she had been unfaithful. He admitted he stabbed her repeatedly with a pair of scissors and a small knife, but denied wanting to kill her. The defense also presented testimony from a doctor, who testified Mei's injuries were not life-threatening.

The jury found Wong guilty of attempted murder and found the special allegations to be true.

*The Sentence*

Wong was sentenced to life in state prison, plus a consecutive term of five years for the great bodily injury enhancement, plus three consecutive one-year terms for each of the deadly weapon enhancements.[4]

Wong objected to the imposition of the three one-year terms for each of the deadly weapon enhancements, contending section 1170.1, subdivisions (f) and (g), prohibited the imposition of more than one deadly weapon enhancement and one great bodily injury enhancement. The trial court rejected Wong's argument, finding that section 1170.1 applies only to determinate sentences, not indeterminate sentences. The trial court relied on *People v.*

---

[4]    We note the trial court and parties referred to the total sentence as "15 years to life" and to the base term as "7 years to life." This usage was adopted in the appellate briefs as well. This is common shorthand to refer to a life sentence with minimum parole eligibility. However, the shorthand pronouncement is incorrect because it indicates a minimum term exists, rather than a minimum parole eligibility. For example, the Penal Code specifies "every person guilty of murder in the second degree shall be punished by imprisonment in the state prison for a term of 15 years to life." (§ 190, subd. (a).) Thus, a sentence for second degree murder specifies a minimum term of 15 years and is part of the sentence that is pronounced. On the other hand, section 664, subdivision (a), provides a person found guilty of an attempt to commit a willful, deliberate, and premeditated murder "shall be punished by imprisonment in the state prison for life with the possibility of parole[;]" there is no minimum term specified under the statute. Instead, there is a minimum parole eligibility of seven years, but that is not part of the sentence that is pronounced. Thus, a more accurate statement of the sentence for attempted murder is simply "life, plus" any determinate enhancements.

*Williams* (2004) 34 Cal.4th 397 (*Williams*), and reasoned, "*Williams* couldn't have been more clear that 1170.1 simply does not apply to indeterminate sentences.  There is no getting around that; so I think the analysis is under 654.  So I tend to agree with the People, at least the way in which the conduct occurred here, is that the defendant, according to the evidence, independently and separately chose a new weapon each time he lost one or it was knocked out of his hand, thrown across the room, broken, or the victim fled.  It seemed to be then that while it was in a way in this course of conduct it was a separate reach for each dangerous, deadly weapon to be carrying out the attempted murder in a different way each time.  I think under that analysis, it doesn't violate 654."

The trial court acknowledged that *Williams* addressed "multiple counts and whether you can have additional weapons enhancements for each count.  This is a slightly different issue, whether one can have multiple weapons enhancements as to a single count.  I don't think necessarily *Williams* answers it entirely."  However, it concluded, "I actually have the *Williams* case in front of me.  It does state on page 402 that, quote, 'section 1170.1, however, applies only to determinate sentences.  It does not apply to multiple indeterminate sentences.'  So I think the analysis that controls here is that under 654, and the way the conduct unfold[ed] here, and the way in which the multiple dangerous and deadly weapons were used here, I think that it is permissible, appropriate, and indeed required for the court to impose the three separate one-year sentencing enhancements consecutively."

Wong timely appealed.

## DISCUSSION

Wong contends the trial court erred in imposing three consecutive one-year terms for each of the deadly weapon enhancements on the single attempted murder count for which he was convicted. We agree.

## I. Governing Law

In *People v. Ahmed* (2011) 53 Cal.4th 156 (*Ahmed*), the California Supreme Court addressed the issue of how multiple enhancements interact when they are attached to one offense. There, the defendant shot his girlfriend in the stomach with a handgun. Based on this act, a jury convicted him of assault with a firearm and found true two enhancement allegations: personal use of a firearm (§ 12022.5, subd. (a)) and infliction of great bodily injury under circumstances involving domestic violence (§ 12022.7, subd. (e)). (*Ahmed,* at p. 160.) The appellate court stayed one of the enhancements pursuant to section 654, and the People appealed. On review, the defendant argued that only one of the enhancements could be imposed because both were based on the same act: shooting the victim in the stomach. (*Ahmed,* at p. 160.)

*Ahmed* rejected this argument and set forth the proper procedure for considering when a court may impose multiple enhancements for a single crime. (*Ahmed, supra,* 53 Cal.4th at pp. 160–161.) The court advised, "courts should look first to the statutory language concerning the enhancements to determine how they interact and consider section 654 only if those statutes do not provide the answer." (*Id.* at p. 161.) The court explained, the statutes will "often" supply the answer to whether multiple enhancements may be imposed. (*Id.* at p. 163.) Because a specific statute prevails over a more general one relating to the

8

same subject, the court should apply the answer from the specific sentencing statute and "stop there." (*Id.* at p. 159.) As a result, the court examined section 1170.1, subdivisions (f) and (g), which addressed the enhancements at issue, and found it was enacted "to permit the sentencing court to impose both one weapon enhancement and one great-bodily-injury enhancement for *all* crimes." (*Ahmed,* at p. 168.)

While the court acknowledged that its holding rendered a section 654 analysis unnecessary, it chose to fully explain how and when section 654 would apply to multiple enhancements. (*Ahmed,* at p. 164.) It began by describing the role enhancements serve in a sentencing scheme, explaining, " '[e]nhancements typically focus on an element of the commission of the crime or the criminal history of the defendant which is not present for all such crimes and perpetrators and which justifies a higher penalty than that prescribed for the offenses themselves.' " (*Id.* at p. 161, quoting *People v. Hernandez* (1988) 46 Cal.3d 194, 207–208.) " '[T]here are at least two types of sentence enhancements: (1) those which go to the nature of the offender [status enhancements]; and (2) those which go to the nature of the offense [conduct enhancements].' " (*Ahmed,* at p. 162, quoting *People v. Coronado* (1995) 12 Cal.4th 145, 156.) Section 654 does not apply to the first category of enhancements but does apply to the second category. (*Ahmed,* at p. 162.) *Ahmed* concluded section 654 prohibited the imposition of multiple enhancements of the same type, but permitted multiple enhancements of different types. (*Ahmed,* at p. 162.)

*Ahmed* involved a determinate sentence. The Supreme Court had previously reviewed the application of section 1170.1 to an indeterminate sentence in *Williams, supra,* 34 Cal.4th 397.

9

There, the defendant was convicted of three sexually violent crimes and suffered two prior convictions for serious or violent felonies. He was sentenced to a determinate term of 20 years and to two consecutive indeterminate life sentences under the Three Strikes law. (*Id.* at p. 401, fn. 3.)

In a prior case, the court had determined that when imposing status enhancements on multiple determinate counts, they " 'have nothing to do with particular counts but, since they are related to the offender, are added only once as a step in arriving at the aggregate sentence.' " (*Williams, supra,* 34 Cal.4th at p. 402.) The court, however, declined to apply the same rule to multiple *indeterminate* terms under the Three Strikes law. It held that section 1170.1 "applies only to *determinate* sentences. It does not apply to multiple indeterminate sentences imposed under the Three Strikes law." (*Williams,* at p. 402.) As a result, status enhancements are added to each indeterminate count, even if there are multiple status enhancements.

## II.    Analysis

With *Ahmed* to guide our analysis, we first examine the specific statutes relating to sentencing enhancements for the use of deadly weapons. If those specific statutes provide the answer, our analysis is complete. If not, we turn to consider section 654. In this case, we find it necessary to turn to the second step. Therefore, we address the application of section 654 to the facts of this case.[5]

---

[5]     We recognize this case presents unusual facts in that cases addressing multiple weapon enhancements typically are resolved using section 1170.1, not section 654. Indeed, Wong notes he did not find any case authority involving multiple weapon

## A. Section 1170.1 Does Not Apply in This Case

We turn first to the applicable sentencing statutes. Section 12022, subdivision (b)(1), states: "A person who personally uses a deadly or dangerous weapon in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for one year, unless use of a deadly or dangerous weapon is an element of that offense." By its express language, section 12022, subdivision (b)(1) does not prescribe the number of deadly weapon enhancements which may be imposed on any one count. Instead, it states only that *an* additional one-year sentence must be imposed on anyone who personally uses a deadly or dangerous weapon.

Wong argues section 12022, subdivision (b)(1), is circumscribed by section 1170.1, subdivision (f), which provides: "When two or more enhancements may be imposed for being armed with or using a dangerous or deadly weapon or a firearm in the commission of a single offense, only the greatest of those enhancements shall be imposed for that offense. This subdivision shall not limit the imposition of any other enhancements applicable to that offense, including an enhancement for the infliction of great bodily injury." Wong reads this provision as expressly prohibiting the imposition of multiple weapon enhancements to his sentence. We disagree with him on this point.

---

enhancements which were not decided based on section 1170.1, subdivision (f). Our independent research has not revealed such a case either.

The Supreme Court has consistently held that "[s]ection 1170.1 . . . applies only to *determinate* sentences.  It does not apply to . . . indeterminate sentences . . . ." (*Williams, supra,* 34 Cal.4th at p. 402; *People v. Felix* (2000) 22 Cal.4th 651, 656, 659 (*Felix*) [section 1170.1 only applies to determinate sentences]; *People v. Mason* (2002) 96 Cal.App.4th 1, 15.)  Here, it is undisputed that a life sentence such as Wong's is an *indeterminate* term.  (*Felix, supra,* 22 Cal.4th at p. 657.)  As a result, we agree with the trial court's analysis that section 1170.1 does not apply in this case to limit the number of deadly weapon enhancements which may be imposed.

To circumvent *Williams,* Wong argues its holding only applies to subdivision (a) of section 1170.1, which addresses status enhancements, and does not apply to section 1170.1, subdivisions (d) through (g), which deal with conduct enhancements.  Not so.  First, *Williams* did not differentiate between the subdivisions in its analysis.  Neither did *Felix.* Indeed, the California Supreme Court has explained that section 1170.1 is part of the Determinate Sentencing Act, whereas indeterminate sentences, on the other hand, are authorized under section 1168, subdivision (b).  (*People v. Scott* (1994) 9 Cal.4th 331, 349.)

Despite the clear holdings that section 1170.1 only applies to determinate sentences, Wong points to language in section 1170.1, subdivision (d), that refers to both determinate and indeterminate terms, to support his cause.  His reliance on subdivision (d) is misplaced.

Section 1170.1, subdivision (d) states:

"When the court imposes a sentence for a felony pursuant to *Section 1170 or subdivision (b) of Section 1168*, the court shall also impose, in addition and consecutive to the offense of which the person has been convicted, the additional terms provided for any applicable enhancements. If an enhancement is punishable by one of three terms, the court shall, in its discretion, impose the term that best serves the interest of justice, and state the reasons for its sentence choice on the record at the time of sentencing. The court shall also impose any other additional term that the court determines in its discretion or as required by law shall run consecutive to the term imposed under *Section 1170 or subdivision (b) of Section 1168*. In considering the imposition of the additional term, the court shall apply the sentencing rules of the Judicial Council." (Italics added.)

Wong theorizes that the language in section 1170.1, subdivision (d), may be extended to subdivisions (f) and (g) because each of these subdivisions address conduct enhancements while subdivision (a) addresses status enhancements. Thus, Wong posits section 1170.1, subdivisions (d) through (g), apply to both determinate and indeterminate sentences while 1170.1, subdivision (a), applies only to determinate sentences.

We find Wong's theory to be unsupported by the language of the statute. Although section 1170.1, subdivision (d), does refer to determinate terms under section 1170 and indeterminate terms under section 1168, these references are not also contained

13

in section 1170.1, subdivisions (f) or (g).  In addition, Wong has provided no legislative history or other legal authority that would allow us to read into subdivision (f) a requirement that it apply to both determinate and indeterminate terms.  Moreover, there is no indication that section 1170.1, subdivision (d), which addresses the imposition of "any applicable enhancements," means enhancements of the same type as those in subdivisions (f) or (g) such that it is reasonable to group them together.

While *Williams* did not address the precise issue at hand— whether the trial court may impose three separate weapon enhancements to one indeterminate term—the holding in *Williams* is unambiguous and binding.  *Williams* holds that section 1170.1 only applies to determinate terms.  Because Wong was sentenced to an indeterminate term, section 1170.1 subdivision (f), does not limit the number of enhancements that may be imposed.

## B. Section 654 Does Not Bar Punishment for Different Types of Enhancements But Does Bar Multiple Punishment for the Same Type of Enhancements

Having determined the specific statutes do not provide the answer to the multiple enhancements at issue in this case, we now turn to the proscriptions of section 654, as required under *Ahmed.*  Wong asserts two arguments under section 654.  First, he urges us to remand to the trial court to determine whether to stay all three deadly weapon enhancements because they stem from the same conduct as the great bodily injury enhancement.  This argument lacks merit.  Second, he argues two of the three deadly weapon enhancements should be stayed under section 654.  This argument has merit.

14

To address Wong's arguments, we again turn to *Ahmed*. *Ahmed* provided a reasoned analysis of when and how enhancements based on a defendant's conduct during a single crime fall within section 654's ambit. (*Ahmed, supra*, 53 Cal.4th at p. 163.) The court explained, "enhancements are different from substantive crimes, a difference that affects *how* section 654 applies to enhancements. Provisions describing substantive crimes, such as the assault with a firearm in this case, generally define criminal *acts*. But *enhancement provisions do not define criminal acts; rather, they increase the punishment for those acts*. They focus on *aspects* of the criminal act that are not always present and that warrant additional punishment. [Citations.]" (*Id.* at p. 163, italics added, fn. omitted.)

In *Ahmed,* the personal use of a firearm and great bodily injury enhancements were both found true in the same assault count where the defendant shot the victim in the stomach. Although based on one act—shooting the victim in the stomach—the enhancements addressed two different aspects of that criminal act: the resulting great bodily injury and the defendant's use of a firearm, each of which could be additionally punished. (*Ahmed, supra,* 53 Cal.4th at pp. 163–164.)

The court also noted, "[c]onversely, sometimes separate enhancements focus on the same aspect of a criminal act. For example, numerous weapon enhancements exist. (E.g., §§ 12022, subd. (a) [being armed with a firearm], 12022.5 [use of a firearm], and 12022.53, subd. (b) [use of a firearm in the commission of specified offenses], 12022.53, subd. (c) [discharging a firearm in the commission of specified offenses].) As another example, numerous great-bodily-injury enhancements exist. (E.g., § 12022.7, subd. (a) [a general great-bodily-injury enhancement],

15

subd. (b) [great bodily injury causing the victim to become comatose or suffer permanent paralysis], subd. (c) [great bodily injury on a person 70 years of age or older], subd. (d) [great bodily injury on a child under the age of five years], and subd. (e) [the enhancement in this case].)" (*Ahmed, supra,* 53 Cal.4th at p. 164.) *Ahmed* concluded, "when applied to multiple enhancements for a single crime, section 654 bars multiple punishment for the same *aspect* of a criminal act." (*Ibid.*)

Here, just as in *Ahmed,* the conduct enhancements that seek to punish different aspects of the crime—the use of a deadly or dangerous weapon and the infliction of great bodily injury—were properly separately punished. However, all three of the deadly weapon enhancements were not lawfully separately punished because they applied to the same aspect of a criminal act, the use of weapons in committing the crime. In other words, the attempted murder count was the single criminal act, and the three different types of weapons used to commit it did not convert that crime into three separate criminal acts. Although the enhancements for the use of deadly weapons involved different types of weapons, they all involved the same aspect of one crime. Under *Ahmed,* section 654 bars multiple punishment for the same aspect of a criminal act.

This conclusion comports with a finding that Wong had a single objective under section 654 and the use of the three weapons was merely incidental to or was the means of accomplishing or facilitating that single objective. As a result, only one of the three deadly weapon enhancements may be separately punished for Wong's sole count of attempted murder.

The People argue punishment on all three deadly weapon enhancements does not violate section 654 even assuming Wong had only one objective. They cite cases which hold "[a] person who commits separate, factually distinct, crimes, even with only one ultimate intent and objective, is more culpable than the person who commits only one crime in pursuit of the same intent and objective." (*People v. Latimer* (1993) 5 Cal.4th 1203, 1211.) Courts have held that "a course of conduct divisible in time, although directed to one objective, may give rise to multiple violations and punishment." (*People v. Beamon* (1973) 8 Cal.3d 625, 639, fn. 11; *People v. Kwok* (1998) 63 Cal.App.4th 1236, 1253.) In determining whether criminal offenses are temporally divisible, courts consider whether the defendant had an "opportunity to reflect and to renew his or her intent before committing the next [offense], thereby aggravating the violation of public security or policy already undertaken." (*People v. Gaio* (2000) 81 Cal.App.4th 919, 935.) Under the People's analysis, Wong had three opportunities to "reflect and to renew" his intent before committing the next offense.

The People's argument does not fully appreciate the distinction in *Ahmed* between crimes and enhancements. Under *Ahmed,* the fact that Wong used three different weapons does not change the fact that he committed but one crime. His use of three weapons cannot divide his one crime—attempted murder— into three different criminal acts. Had Wong been charged with three separate acts of assault, for example, the enhancement of each separate crime would have been appropriate. That simply is not the case here. In this case, the trial court impermissibly imposed three weapons enhancements on one attempted murder count.

17

## DISPOSITION

The judgment is affirmed, and the sentence is modified to reflect the imposition of three deadly weapons enhancements, two of which are stayed under section 654.  The trial court is directed to issue a new abstract of judgment.


                              BIGELOW, P.J.


We concur:



        RUBIN, J.



        GRIMES, J.