Filed 9/8/23  P. v. Mendoza CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JOHN GILBERT MENDOZA,<br><br>Defendant and Appellant. | B316642<br><br>Los Angeles County<br>Super. Ct. No. VA147093 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Debra A. Cole, Judge.  Affirmed with instructions.

Law Offices of Allen G. Weinberg and Allen G. Weinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Scot A. Taryle, Supervising Deputy Attorney General, and Viet H. Nguyen, Deputy Attorney General, for Plaintiff and Respondent.

_____

A jury convicted John Gilbert Mendoza of first-degree murder, willful, deliberate, and premeditated attempted murder, and being a felon in possession of a firearm. Mendoza appeals the murder and attempted murder convictions based on alleged instructional error. We affirm but order corrections to the minute order and abstract of judgment. Statutory citations are to the Penal Code.

I

Mendoza had children with Gabriel Lopez, the aunt of Valerie Ibarria. In March 2015, Ibarria was with Lopez at Maggie's Bar. Mendoza was also there with his girlfriend, Monique Palacios. Ibarria believed Mendoza was disrespecting her aunt. According to Ibarria, she and her aunt encountered Mendoza in the parking lot, and Ibarria told Mendoza to leave her aunt alone. Mendoza then hit her in the eye. Ibarria tried to hit him back but could not. Mendoza left, and Ibarria called Juan Mila, the father of her child, to come pick her up because she could not drive. Mila did so and did not bring a gun.

Palacios told a different story of that night. She said Ibarria came to their table three or four times and yelled and cursed at Mendoza. Palacios and Mendoza went to the parking lot. While Mendoza was next to his motorcycle, Ibarria ran up and attacked him, hitting him. Mendoza put up his arm to stop her, and Ibarria ran into his arm and fell down. Ibarria then said she was going to call her baby's father to come shoot Mendoza. After Mendoza left, a man drove up and asked Ibarria, "where's he at, so I could shoot him." Palacios met Mendoza later at her house and told him about the man and what he had

2

said.  Palacios conceded on cross-examination she had never mentioned this to the police or to Mendoza's attorney until the day before the trial began.  Mendoza confirmed Palacios' version of events, though he said he had not heard exactly what Ibarria said before he left.

In February 2018, Ibarria went to a bar with a man she was dating, Adrian Quesada, to celebrate her graduation from a dental assistant program.  Ibarria's uncle, her uncle's girlfriend, and Ibarria's cousin were already at the bar.  Ibarria had done a few lines of cocaine before arriving.  While in the bar, Ibarria saw Mendoza wearing a t-shirt that said security.  She did not know before seeing him that he worked at the bar.  After having a drink, Ibarria and Quesada went outside to Quesada's car to smoke and make out.  While they were outside, Mendoza approached his fellow security guard, Isaiah Savage, who was working the door, and, without giving a reason, told him not to let Ibarria and Quesada back in the bar.

When Ibarria and Quesada returned to the bar's entrance, Savage told them he had been instructed not to let them re-enter.  Ibarria calmly asked whether she could tell her family she could not come back in and say goodbye.  Savage agreed that she could do so, but said Quesada had to remain outside.  As Ibarria tried to re-enter the bar, Mendoza stopped her.  At this point, accounts of what happened begin to differ.

Ibarria said Mendoza pushed her back out of the bar.  As he did so, he said, "Fuck that.  You called child services on me."  Quesada asked Mendoza, "Why are you pushing her; she's a female."  Mendoza again said Ibarria had called child services on him.  Quesada told Mendoza that Ibarria was just trying to say goodbye to her family.  Mendoza responded, "Fuck that.  You

don't know who the fuck I am." Quesada responded, "You don't know who I am," and "don't be fucking talking to me like that." Ibarria testified that she heard someone say, "He's gonna go get his gun." Quesada said, "Let's go. Let's leave," and Ibarria and Quesada hurried toward Quesada's car.

According to Savage, after Mendoza stopped Ibarria from entering the bar, they argued, and Savage heard something about social services. Quesada told Mendoza, "Don't bring your personal life into this." Savage then pulled Quesada aside to calm him down. Quesada listened to Savage, and said, "You're right. Imma go." Ibarria and Quesada returned to their car, not saying anything further to Mendoza.

Mendoza claimed he "ushered" Ibarria out of the bar, but did not touch her. As he did so, Mendoza told Ibarria she was not coming back in because she kept calling social services on him. Mendoza said Quesada said something about not touching Ibarria. Savage then spoke to Quesada while Ibarria and Mendoza "exchanged words" that Mendoza could not remember. At further questioning from his attorney about his exchange with Quesada, Mendoza said, "Um, well, I guess you could say we verbally assaulted each other. Um, called each other out of our names, cussed at each other. Things of that nature." In an earlier interview with police, Mendoza said, Ibarria said, "Really? This is why you're gonna fucken do this?" Ibarria and Quesada started "talking shit." Quesada said, "who the fuck are you," "don't bring your personal problems to work," "[f]uck you, motherfucker," and "[y]ou ain't shit." Mendoza said Quesada "kind of pushed up" on him by taking a few steps toward him so he was about seven feet away.

4

All the witnesses agreed that after the encounter at the door, Ibarria and Quesada headed toward Quesada's car. Savage testified that as he watched them go toward the car, he heard a gun cock and saw in his peripheral vision Mendoza holding a gun out in front of him. Mendoza began moving toward Quesada's car. When Savage heard gunshots, he began trying to get everyone inside the bar.

Mendoza claimed he followed Quesada and Ibarria toward the car to tell them to leave because Ibarria was standing outside the car and not getting in. Mendoza testified he was not saying anything to them. On cross examination, he testified he said, "Let's get down. Let's do this shit." He testified he was afraid but went toward them because it was his job to get them out of the parking lot, and he did not want them to stay any longer. Mendoza said when he was 20 to 25 feet away, he heard gunshots. A bullet hit the right lower side of his stomach. He reached for his gun, and another bullet hit his hand and a third hit under his arm. He began shooting at Quesada's car with his other hand. He said Savage's testimony that he had a gun in his hand as he walked toward the car was untrue.

Ibarria testified Quesada got into the driver's side and started the car. He yelled at Ibarria, to "Get in, get in!" Ibarria opened the passenger side door and saw Mendoza walking toward her with a gun. She saw Mendoza fire the gun and felt bullets hit her legs. Ibarria fell to the ground. She heard additional bullets hitting the car. Quesada again told Ibarria to "get in," but she could not. Quesada drove out of the parking lot.

Quesada managed to leave the parking lot and begin driving on Imperial Highway, but crashed into a wall less than a mile away. Police found his body in the crashed car along with a

5

gun, expended cartridge casings, and fired bullets and bullet fragments. Quesada died as a result of multiple gunshot wounds. Police determined the gun found in the car fired the casings found in the car, but it did not fire the bullets and bullet fragments. The car bore 13 strike marks and bullet holes. Police collected 14 expended casings in the parking lot of the bar and determined they were all fired by the same .9 millimeter gun.

Paramedics took Ibarria to a hospital. She sustained three gunshot wounds to her legs and was in the hospital for about three and a half weeks. At the time of the trial, she was still suffering from the injuries, including trouble walking, lack of feeling in her foot, and an inability to stand for long periods of time. Police spoke to Ibarria while she was in the hospital. She initially claimed not to know Quesada. The next day, she called one of the officers and asked to speak again. During the interview the following day, she admitted she had come to the bar with Quesada and explained she had initially denied it because she had a boyfriend in jail who she did not want to know about Quesada.

After the shooting, Mendoza returned to the bar and a patron he knew as Sags drove Mendoza to the hospital in Mendoza's truck. Mendoza told police he instructed Sags to leave the truck in the handicap parking and later told his brother to move the truck. Police recovered the truck from an impound lot several days later. Police never found the gun Mendoza claimed he had left in the center console of the truck.

Police spoke to Mendoza while he was at the hospital. He repeatedly denied having a gun or having shot a gun that night. (By trial, Mendoza changed his story on this point.) At the hospital, he told the officers he followed Ibarria and Quesada

6

because Quesada was still "talking shit" as he walked away. Mendoza was angry and responded, "Well, what's up fool? . . . Let's handle this. Let's get down. Let's do this shit." He told the officers he had a knife in his hand as he did so. Mendoza claimed he then saw another man in flannel coming from the side and flashes of gunfire from the car. Mendoza told the officers he had never had a physical altercation with Ibarria before. The officers took Mendoza's phone and later searched the data. The police found a picture of a .9 millimeter gun Mendoza identified at trial as the gun he shot that night. The gun pictured could have fired the expended cartridges found in the parking lot.

Mendoza testified at trial. He stated that part of his job as a security guard for the bar was to make sure patrons who security asked to leave did not remain in the parking lot. He said the bar's policy was to give the patrons ten to 15 minutes to leave, and if they did not, security would inform the bar's management. The bar's management would then instruct security what to do next. Mendoza claimed he did not follow this policy here because he wanted Ibarria and Quesada to leave as soon as possible. The bar's policy was that security personnel would be unarmed.

Mendoza further testified that he felt nervous about Ibarria and Quesada being there because he did not know if Quesada was the man Palacios had seen come to pick Ibarria up with a gun before. Mendoza conceded he was not in danger when Ibarria and Quesada walked away toward Quesada's car. He stated he did not shoot because he was mad but because someone was shooting at him.

The parties stipulated that Mendoza had a previous felony conviction.

7

Defense counsel informed the court she was not seeking an instruction on voluntary manslaughter based on heat of passion. Defense counsel did ask the court to give CALCRIM No. 3475 "Right to Eject Trespasser from Real Property." That instruction reads:

"The (owner/lawful occupant) of a (home/property) may request that a trespasser leave the (home/property). If the trespasser does not leave within a reasonable time and it would appear to a reasonable person that the trespasser poses a threat to (the (home/property)/ [or] the (owner/ [or] occupants), the (owner/lawful occupant) may use reasonable force to make the trespasser leave.

"*Reasonable force* means the amount of force that a reasonable person in the same situation would believe is necessary to make the trespasser leave.

"[If the trespasser resists, the (owner/lawful occupant) may increase the amount of force he or she uses in proportion to the force used by the trespasser and the threat the trespasser poses to the property.]

"When deciding whether the defendant used reasonable force, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed.

8

"The People have the burden of proving beyond a reasonable doubt that the defendant used more force than was reasonable. If the People have not met this burden, you must find the defendant not guilty of *<insert crime>*."

The parties argued the issue both on and off the record. The trial court stated it was not sure the evidence showed Ibarria and Quesada were trespassers because they had not been told to leave the parking lot. After reviewing Mendoza's testimony that Ibarria and Quesada were standing outside the car, not getting in, the trial court said it would allow the parties to argue the issue. However, after reviewing instructions defining trespassing and re-reviewing the testimony, the trial court reversed itself. The court concluded Ibarria and Quesada were not trespassers because they had not been told to leave the parking lot, and it would be confusing to the jury to introduce the issue.

During closing argument, defense counsel argued Mendoza had acted in self-defense. She said Mendoza had a reasonable fear because he had been told a man had come to Maggie's Bar with a gun at Ibarria's summoning. She argued that the fact that Quesada did have a gun and used it showed the reasonableness of Mendoza's fear. She urged the jury to believe Mendoza's statement that he walked up to the car with a knife hidden in his hand and only got out his gun and shot after he had been shot three times, acting in self-defense.

The jury found Mendoza guilty of the first-degree murder of Quesada, the willful, deliberate, and premeditated attempted murder of Ibarria, and of being a felon in possession of a firearm.

Mendoza appeals his convictions of first-degree murder and willful, deliberate, and premeditated attempted murder.

## II

Mendoza argues his convictions of first-degree murder and willful, deliberate, and premeditated attempted murder must be overturned because the trial court erred in failing to give instructions on voluntary manslaughter based on heat of passion and the right of a lawful occupant to use reasonable force in ejecting trespassers. Neither argument has merit. As a separate matter, we order sentencing corrections.

## A

The trial court did not err in refusing to give a voluntary manslaughter based on heat of passion instruction.

Trial courts have a sua sponte duty to give instructions on lesser offenses when the evidence is such that a reasonable jury could find the defendant committed the lesser but not the greater offense. (*People v. Breverman* (1998) 19 Cal.4th 142, 148-149, 162.) The instruction on a lesser included offense is unnecessary when substantial evidence does not support that offense. (*People v. Moye* (2009) 47 Cal.4th 537, 554-555 (*Moye*).)

A murder may be reduced to voluntary manslaughter where the defendant acted under the heat of passion. (§ 192, subd. (a).) The defense has two components: a subjective one and an objective one. (*People v. Jones* (2014) 223 Cal.App.4th 995, 1000.) To meet the subjective criterion, the defendant's passions must have actually been aroused by the victim at the time of the killing. (*Ibid.*) Most significantly here, to meet the objective criterion, the provocation offered by the victim must have been sufficient that a reasonable person would react from passion

10

rather than judgment.  (*People v. Beltran* (2013) 56 Cal.4th 935, 938-939.)

Case law provides concrete examples of provocation that is insufficient as a matter of law.  Taunting words, a technical battery, a slight touching, or simple assault is not enough.  (*People v. Gutierrez* (2009) 45 Cal.4th 789, 826-827 (*Gutierrez*).)  A verbal argument with expletives together with a tussle involving chest scratching and kicking similarly does not warrant an instruction on voluntary manslaughter.  (*Ibid*.)  Where the victim called the defendant a motherfucker and repeatedly challenged the defendant to use a weapon if he had one, the provocation was plainly insufficient.  (*Ibid*.)

The evidence here at most shows Ibarria "talked shit," though the only specifics Mendoza provided was that Ibarria said, "Really?  This is why you're gonna fucken do this?"  As to Quesada, Mendoza testified they "verbally assaulted each other."  According to Mendoza, Quesada told him not to push Ibarria and said, "who the fuck are you," "don't bring your personal problems to work," "[f]uck you, motherfucker," and "[y]ou ain't shit."  Mendoza said Quesada "kind of pushed up" on him by taking a few steps toward him.   However, even at that point, Quesada was still seven feet away from Mendoza.

These exchanges were insufficient to cause a reasonable person to act from passion rather than judgment.  (*Gutierrez*, *supra*, 45 Cal.4th at pp. 826-827.)  The victims spoke expletives and taunting words.  Neither Ibarria nor Quesada touched Mendoza.  The only evidence of physical force was Ibarria's statement that Mendoza pushed her out of the doorway of the bar.  Because there was not substantial evidence of sufficient objective provocation, the trial court's decision not to give a

11

voluntary manslaughter based on heat of passion instruction was proper.

B

The trial court did not err in failing to give CALCRIM 3475 because substantial evidence did not support it. (*Moye*, *supra*, 47 Cal.4th at p. 555.)

CALCRIM 3475 identifies several elements that must be present for it to come into play. One element is that a trespasser has failed to leave within a reasonable time after being asked to do so. The surveillance video and Savage's testimony establish gunshots began within about a minute of Ibarria and Quesada departing from the bar's entrance after being told to leave. About one minute does not exceed a reasonable time.

C

At the August 30, 2021 sentencing hearing, the trial court sentenced Mendoza to "life with the possibility of parole, with a minimum parole date of seven years" for the attempted murder conviction. The minute order and abstract of judgment state the sentence on this conviction is seven years to life. We order the trial court to correct the minute order and abstract of judgment to reflect that the sentence on the attempted murder conviction is a life term with the possibility of parole after seven years, consistent with the court's oral pronouncement at the hearing. (*People v. Wong* (2018) 27 Cal.App.5th 972, 977 fn. 4 [common shorthand of "7 years to life" is inaccurate because it suggests a minimum term exists rather than a minimum parole eligibility].)

12

## DISPOSITION

We order the trial court to correct the minute order and abstract of judgment to reflect that the sentence for Mendoza's conviction for willful, deliberate, and premeditated attempted murder is a life term with the possibility of parole after seven years. We otherwise affirm the judgment.

WILEY, J.

We concur:

STRATTON, P. J.

VIRAMONTES, J.

13