Filed 7/15/20

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
|     Plaintiff and Respondent, | A155630 |
| v. | |
| QUENTIN BOWEN, | (Sonoma County |
|     Defendant and Appellant. | Super. Ct. No. SCR-701060) |

Defendant Quentin Bowen appeals from a judgment after a jury trial finding him guilty of one count of attempted murder committed willfully, deliberately and with premeditation, with a great bodily injury enhancement and a personal knife use enhancement, and one count of assault with a deadly weapon, with a great bodily injury enhancement. Defendant complains of improper admission of certain evidence, prosecutorial misconduct during closing argument, and insufficient evidence of premeditation and deliberation, and that his sentence for attempted murder is unauthorized. We affirm.

**BACKGROUND**

On July 19, 2017, the Sonoma County District Attorney filed an information charging defendant with attempted murder (Pen. Code, §§ 664,

---

    \* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II through V of the discussion.

1

187, subd. (a); count one)[1] and assault with a deadly weapon (§ 245, subd. (a); count two). With respect to count one, the information alleged an enhancement of personal use of a deadly and dangerous weapon, to wit, a knife (§ 12022, subd. (b)(1)), and that defendant committed the attempted murder willfully, deliberately and with premeditation. With respect to both counts, the information alleged a great bodily injury enhancement (§ 12022.7, subd. (a)). On March 27, 2018, a jury found defendant guilty as charged and the enhancements to be true. The defendant was sentenced to prison on count one as follows: seven years to life for attempted murder plus a determinate term of three years for the great bodily injury enhancement and one year for the use of a deadly and dangerous weapon enhancement. On count two the defendant was sentenced to four years plus three years for the great bodily injury enhancement. The time imposed for count two was stayed under section 654. Defendant's overall prison sentence was seven years to life consecutive to a determinate term of four years.

## I. Prosecution's Case

In July 2016, defendant placed an online advertisement looking for boarding for his dog, Dash, offering to pay $100 per week. Dennis N., a 62-year-old man, initially agreed to care for Dash for two weeks but later agreed to keep the dog longer at defendant's request. Although Dennis N. took care of Dash for five months, defendant never paid him.

On November 26, 2016, defendant told Dennis N. he had found a place to live and asked Dennis N. to return Dash to him. Dennis N. asked for a few more days with Dash, and defendant agreed. On December 3, 2016, Dennis N. texted defendant: "There is the little matter of compensation/reimbursement for the excellent care that Dash has received. I

---

[1] All further references are to the Penal Code unless stated otherwise.

2

am not a mathematician but 20 weeks (5 months)@$100 per week = a lot.  I'm sure you will do what's right."  Dennis N. thought defendant should "man up and take care of his responsibilities."  Defendant responded that Dennis N. had agreed to "do it pro bono."  After looking up the meaning of "pro bono," Dennis N. texted defendant back:  "Do you understand how Karma works."  A few days later, defendant came to Dennis N.'s home with three other people and took Dash.  The defendant still did not pay Dennis N.

Dennis N. texted defendant a few weeks later asking him what Dash wanted for Christmas.  Defendant responded:  "He'd like a friend for him to play with at your place."  Dennis N. texted back:  "He had a best friend to play with at my place until you took him away."  Defendant responded:  "Ok man, I've been patient with you.  We're done.  You will never see my Dog again. . . .  He needs to go out and meet people EVERY single day.  He needs to RUN.  He also needs the person who raised him.  You are none of those things.  Get your own dog, or kill yourself.  I don't care either way."  Dennis N. thought it was "unbelievable" that defendant would treat him that way after he did him a favor.  Dennis N. texted the defendant back and told him he still owed him $2,000.  Defendant responded by accusing Dennis N. of taking "bad care" of Dash by overfeeding him, underexercising him, and not grooming him.  Defendant further texted that Dennis N. had agreed to "do it for free," "[o]therwise, you lunatic, I would not have let you."  Dennis N. responded that "taking advantage of a disabled senior citizen and swindling them is a crime."  He texted that defendant had "12 hours to apologize . . . and come up with a plan to make this right."  Defendant stopped responding to Dennis N., and Dennis N. dropped the matter.

In March 2017, Dennis N. responded to a new online advertisement placed by defendant regarding Dash.  Although Dennis N. stated he thought

Dash looked sad, he did not ask to take Dash back. Then, one night in March, defendant came to Dennis N.'s mobile home and begged him to take Dash. Dennis N. agreed.

On March 30, 2017, defendant texted Dennis N. that he planned to visit Dash the following day and wanted to put a new tag on him. Defendant went to Dennis N.'s home around noon the next day and stayed for about three hours. During the visit, defendant took off his jacket. Dennis N. observed defendant was wearing a black T-shirt underneath. Defendant groomed Dash, put the new tag on him, and filled out paperwork for Dash to attend an activity center. Dennis N. noticed defendant was wearing a knife clip on his front pocket, but he did not see the knife. At first, Dennis N. did not think too much about it. Their conversation over the three hours was pleasant, and there was no discussion of the money defendant owed Dennis N.

At one point, Dennis N. reached into his mobile home to get wisteria clippings he wanted defendant to smell. When Dennis N. saw the wisteria was not where he thought, he backed out of the mobile home. Suddenly, Dennis N. was hit hard on the back of his head. He initially thought something had fallen from the roof. As he turned around, defendant stabbed him in the neck two or three times. Dennis N. grabbed defendant's left wrist; defendant was holding the knife in his left hand. Defendant then clubbed Dennis N. on the side of his jaw with a rock. Defendant dropped the rock and switched the knife to his right hand and started stabbing Dennis N. in the neck again. When Dennis N. grabbed defendant's stabbing hand, defendant again switched the knife to his opposite hand. Defendant stabbed Dennis N. twice in the chest and once in the shoulder. Dennis N. asked defendant why he was doing this. Defendant did not respond.

4

Dennis N. eventually placed defendant into a half nelson while gripping the wrist of the hand defendant was using to hold the knife. They tumbled inside the doorway of Dennis N.'s mobile home. Dennis N. had a glimpse of the knife that the defendant used and described it as a three-inch pocket knife that was either silver or possibly red and with holes on the handle.

Dennis N. continued to hold defendant in the half nelson position for several minutes while bleeding from his neck. He told defendant to drop the knife, but defendant refused. He said he was bleeding out and needed medical attention. Defendant said he would help if Dennis N. would let him go. Dennis N. worried defendant would "finish the job" because defendant refused to drop the knife. Ultimately, Dennis N. pushed defendant further into the mobile home and ran down his driveway toward a nearby preschool, yelling for help. Dash followed Dennis N. Although Dennis N. was afraid defendant would pursue him and slit his throat, he looked back and saw defendant walking away with defendant's bicycle.

Sarah R. and Lisa C. were outside their children's preschool when they saw Dennis N., who asked them to call 911. They saw another man walking away with a bicycle through the field toward the trees. Dennis N. held pressure on his neck and returned to his mobile home to wait for the police and paramedics. Officer Adams responded to the scene, and Dennis N. provided the police with the defendant's cell phone number. Dennis N. was taken to the hospital, where he was treated for eight stab wounds. Justin F., a Sonoma County animal control officer, was called to the scene to impound Dash.

Officer Adams had police dispatch contact defendant's mobile phone service provider to determine the defendant's possible location. Shortly

before 6:00 p.m., police dispatch provided Officer Adams with a possible location of the defendant in the area of the Santa Rosa Creek Trail. Officers searched the area, and at 7:18 p.m., they found defendant walking on the trail wearing a backpack, a jacket, and no shirt. Defendant was arrested; his cell phone, backpack, and several knives were seized. Defendant had blood on his right ear, and DNA tests confirmed the blood was consistent with both defendant's and Dennis N.'s.

## II.    Defense Case

Defendant testified that he visited Dennis N. on March 31, 2017, to see Dash and put a tag on him, and he gave Dennis N. money for Dash's food. Dennis N. began acting in a menacing manner after a few hours, and defendant texted his friend Krysta: "Hey, I am at sketchy guys house behind raleys on Fulton. The trailor RIGHT behind the store. [¶] *If I disappear, it was this guy. [¶] His name is Dennis." (*Sic.*) When Dennis N. began to act normally again, defendant agreed to follow him into his mobile home. As they walked into the hallway, Dennis N. suddenly turned around and tried to stab defendant with a large knife. Defendant fell backward onto a pile of items, and Dennis N. again tried to stab him. Defendant grabbed Dennis N.'s hand and maneuvered the knife out of his hand. Dennis N. held defendant down with one hand and hit him in the head with his other hand. Dennis N. was bigger than defendant and defendant could not push him away.

Defendant testified he stabbed Dennis N. because he was afraid for his life. Dennis N. hit defendant on his head and threatened to shoot him. Defendant continued to stab Dennis N. When Dennis N. stopped attacking him, defendant dropped the knife and ran outside. He grabbed his bike and ran through the field. He rode away on his bike until he got a flat tire. He

6

left his bike and started running.  He hid in a ditch because he was afraid Dennis N. might come after him.

While he was in the ditch, defendant received a call from Justin F., the animal control officer.  Although defendant did not remember what he said to Justin F., he testified he did not ask him for help.  Further, he did not call the police or a friend because he was not thinking clearly.

When it became dark, defendant began walking along the creek trail. He testified he was relieved when he saw the police.  He admitted to the police that he had four knives on him but denied he had used any of them during the incident.  One knife was a credit card knife, or novelty knife.  The second knife was a folding knife, which he used to cut food.  The third knife was a red folding knife, which was used to cut insulation at his job.  The fourth knife was a multitool knife with pliers and screwdriver features. Defendant denied he attacked Dennis N. from behind with a rock or that he intended to kill him.

### III.    Rebuttal Evidence

At 4:50 p.m. on March 31, 2017, Justin F. called defendant to tell him he had Dash and asked defendant if he wanted to meet to pick up the dog. Defendant calmly responded that he would call him back, and about 5 to 10 minutes later defendant left Justin F. a voicemail message saying he would meet him at a grocery store in Rohnert Park in about 25 minutes, after an interview ended.  Thirty minutes later, defendant texted Justin F. saying his interview had lasted longer than expected and that he did not have a place for Dash.  Justin F. texted back that he would impound Dash at the Sonoma County Animal Services.  The defendant responded by text and thanked him. Defendant did not ever tell Justin F. that he had been attacked that afternoon.

7

## DISCUSSION

### I.  Cell Phone Ping Did Not Violate Fourth Amendment

Defendant argues the knives should have been excluded because they were the product of a warrantless search in which the police requested that defendant's mobile service provider "ping" his phone and provide location data.

Defendant filed a motion to suppress the evidence seized from his backpack[2] on the grounds that the police failed to obtain a warrant before having defendant's service provider ping his cell phone to locate him.  The People argued the warrantless cell phone ping was justified by exigent circumstances and the officers' good faith reliance on section 1546.1.[3]  At the motion to suppress hearing, Officer Adams testified he was dispatched at 3:37 p.m. to a stabbing incident.  He initially spoke with two witnesses at a preschool behind a shopping center who told him an older man who was bleeding from his neck said he had been stabbed.  They also told Officer

---

[2] On appeal, defendant contests the admission of the knives only, and not any other items seized by the police.

[3] Section 1546.1, subdivision (c)(6) states:  "A government entity may access electronic device information by means of physical interaction or electronic communication with the device only as follows: [¶] . . . [¶] If the government entity, in good faith, believes that an emergency involving danger of death or serious physical injury to any person requires access to the electronic device information."

Subdivision (h) states:  "If a government entity obtains electronic information pursuant to an emergency involving danger of death or serious physical injury to a person, that requires access to the electronic information without delay, the government entity shall, within three court days after obtaining the electronic information, file with the appropriate court an application for a warrant or order authorizing obtaining the electronic information or a motion seeking approval of the emergency disclosures that shall set forth the facts giving rise to the emergency . . . ."

Adams they saw another man walking away through a nearby field. Officer Adams then spoke with Officer Cadaret at the scene of the stabbing, approximately 200 feet from the preschool, and he learned the victim had been repeatedly stabbed in the neck in an unprovoked attack. The victim told the officers that the suspect's dog had a tag with the suspect's cell phone number.

At 4:19 p.m., on the way to the hospital, Officer Adams called police dispatch and asked if the dispatcher could obtain a ping from the suspect's cell phone. Officer Adams explained "it was imperative" that police find the suspect because "[t]he suspect had just been involved in a very violent crime. The victim was brutally stabbed multiple times, seemingly unprovoked, from the information we had. This took place literally less than 200 feet away from a preschool that was—my witnesses were there to pick up their kids, so the preschool was letting out. It's broad daylight in the middle of the afternoon on Friday, and it's right near a large shopping center. There's multiple neighborhoods in the area. The suspect was last seen walking away . . . still possibly armed. And based on the totality of the circumstances, I didn't want anybody else to possibly be the victim." Officer Cadaret also testified at the motion to suppress hearing that the police and a police dog attempted to locate defendant but were unsuccessful before receiving the cell phone ping location information.

At 5:57 p.m., the police learned the suspect's cell phone had pinged on the Santa Rosa Creek Trail east of Willowside Road. Once the police learned the location information, additional officers and resources, including a helicopter, converged on the trail and the defendant was apprehended on the trail at 7 p.m. On April 3, 2017, Officer Cadaret filled out a request for a court order for the cell phone ping.

9

The trial court denied defendant's suppression motion, stating: "There was information that this was an unprovoked attack, fairly brutal in the nature of the attack. Very near a school, shopping center. And the response to the officers hearing about this is to mobilize, even mobilizing a helicopter. There's no doubt in my mind that Officer Adams had a good faith belief that, in fact, there was a serious situation that needed immediate remediation, and the best way to have done that was a ping. [¶] I believe this was a search under California law; but I also believe that based on the evidence of the timing, the circumstances, the response, the—all the different people, including preschool, that the ping was absolutely in a good faith response and necessary."

"On appeal from a denial of a motion to suppress evidence on Fourth Amendment grounds, we review the historical facts as determined by the trial court under the familiar substantial evidence standard of review. Once the historical facts underlying the motion have been determined, we review those facts and apply the de novo standard of review in determining their consequences. Although we give deference to the trial court's factual determinations, we independently decide the legal effect of such determinations." (*People v. Esayian* (2003) 112 Cal.App.4th 1031, 1038.)

Defendant agrees the trial court was correct in finding that the ping of defendant's cell phone was a search but argues no exception to the warrant requirement applied. The People argue first that there was no Fourth Amendment violation because a single ping of defendant's cell phone does not constitute a search. Both parties cite *Carpenter v. United States* (2018) 585 U.S. ___ [138 S.Ct. 2206], which was decided after the verdict but before defendant was sentenced. *Carpenter* held that accessing seven days of

10

historical CSLI[4] providing a record of a defendant's past physical movements constituted a Fourth Amendment search. (*Carpenter*, *supra*, 138 S.Ct. at p. 2217 & fn. 3.) However, *Carpenter* declined to "decide whether there is a limited period for which the Government may obtain an individual's historical CSLI free from Fourth Amendment scrutiny, and if so, how long that period might be" (*id*. at p. 2217, fn. 3), nor did the Supreme Court "express a view on matters not before [it, including] real-time CSLI" (*id*. at p. 2220). The parties do not cite any California cases addressing whether obtaining real-time CSLI constitutes a search, and we are unaware of any published authority on this issue. Because we conclude that exigent circumstances justified the officers' pinging defendant's cell phone, we need not decide whether a single real-time ping of defendant's cell phone was a search.

" 'A long-recognized exception to the warrant requirement exists when "exigent circumstances" make necessary the conduct of a warrantless search. . . . " '[E]xigent circumstances' means an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall imminent escape of a suspect or destruction of evidence. There is no ready litmus test for determining whether such circumstances exist, and in each case the claim of an extraordinary situation must be measured by facts known to the officers." ' " (*People v. Panah* (2005) 35 Cal.4th 395, 465.) The reasonableness of the officers' conduct depends upon whether facts available at the moment of the search support a reasonable belief that the action taken was appropriate. (*Ibid*.)

---

[4] CSLI stands for "cell-site location information." (*Carpenter v. United States*, *supra*, 138 S.Ct. at p. 2211.)

Here, at the time Officer Adams requested a ping of defendant's cell phone, the information available to him was that less than an hour earlier Dennis N. had been repeatedly stabbed in the neck in an unprovoked attack, within 200 yards of a preschool and near a shopping center and multiple neighborhoods. Further, the suspect, who was possibly still armed with a knife, had fled on foot. The area where the witnesses indicated the defendant had headed was a several-hundred-yard field with multiple entrances and exits leading to a creek trail, houses and apartment complexes, and a store; and there are "hundreds of people moving about" the area. The police were actively looking for defendant when they received the CSLI. Based upon the circumstances known to Officer Adams, he believed it was imperative that the suspect be found as soon as possible to prevent another possible unprovoked attack. We agree with the trial court's determination that the exigent circumstances exception applies under the facts of this case, and defendant's motion to suppress was properly denied.

Defendant cites *People v. Ramey* (1976) 16 Cal.3d 263 and argues that the circumstances here were not "an emergency situation requiring swift action to prevent imminent danger to life[.]" (*Ramey*, at p. 276.) *Ramey* involved a warrantless arrest in the defendant's home, and the court found that under the circumstances of Ramey's arrest for the nonviolent crime of receipt of stolen property, there was no imminent danger to life or property and no likelihood of flight or destruction of evidence. (*Ramey*, at p. 276.) Here, the circumstances are readily distinguishable from *Ramey*, and we find they support a finding of exigent circumstances. (See *ibid.* ["There is no ready litmus test for determining whether [exigent] circumstances exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers"].)

Because we find the exigent circumstances exception applied here, we do not reach the People's alternative argument that the police acted in good faith reliance upon section 1546.1, subdivision (h).

## II. Admission of the Recovered Knives

Defendant argues the trial court abused its discretion when it denied his motion in limine seeking to exclude the knives as irrelevant and prejudicial. He argued below, and he argues on appeal, that because the knives recovered from defendant were not "alleged to have been used in any way in this case," they have no probative value and are extremely prejudicial. We find no abuse of discretion.

### A. *Motion In Limine Testimony Regarding the Recovered Knives*

The trial court held a hearing on the defendant's motion[5] during which Officer Cadaret testified that the knife used in the attack was described as having red on it and containing holes and that two of the knives recovered from the defendant "shared descriptions of the knife that was used at the time of the attack." Officer Cadaret testified that one of the knives found on the defendant had a dark brown substance on it that tested negative for blood. The prosecutor argued that although there was no conclusive determination based on DNA or blood testing that any of the knives found on defendant was used in the attack, she was not prepared to stipulate that the recovered knives were not used in the incident. She argued that they were relevant because two of them matched the victim's description of the knife

---

[5] Defendant's motion in limine also argued for exclusion of certain evidence, including the knives, based upon the evidence technician's chain of custody errors, including storing certain evidence in an unsecured location for multiple days and a multiple-day delay in between collecting the evidence and booking it into evidence. These issues are not raised on appeal.

used. During the motion in limine hearing, defense counsel cross-examined Officer Cadaret regarding whether the knives matched the victim's description. He testified that "two of those knives were similar in description to what was given [in that] one of them was red and one of them had holes in it," but he acknowledged that no single knife had both characteristics. Officer Cadaret further testified that officers searched the area around the creek trail because they were uncertain if they had recovered the knife used in the attack.

The trial court denied defendant's motion, stating, "I do believe there is some relevancy that would help the jury . . . decide[] guilt or innocence . . . , and that [defense counsel] can certainly cross-examine the officer as to their non-connection to this case."

## B. *Trial Testimony Regarding the Recovered Knives*

At trial, Dennis N. testified he saw a "glimpse" of the knife and he thought it was a three- or three-and-a-half-inch pocket knife with holes in the handle and that it was silver or possibly red. He testified he thought the red could have been blood. Dennis N. was not shown the knives recovered from the defendant before or during his testimony. Officer Cadaret testified that he understood Dennis N. told another officer that the knife used had holes and a red handle. Officer Cadaret did not initially show Dennis N. the knives recovered from the defendant because he did not think any of them matched Dennis N.'s description. After Dennis N. testified that the red could have been blood, Officer Cadaret showed Dennis N. photographs of the knives.[6] Officer Cadaret testified that Dennis N. told him one of the knives "was

---

[6] It appears from the record that Officer Cadaret is referring to Dennis N.'s trial testimony on March 20, 2018, the day before Officer Cadaret testified.

similar in blade length and the fact that it had holes in the knife, but he did not believe [it] was the knife [used in the attack]."

## C. *Knives Were Relevant and Not Unduly Prejudicial*

We review rulings on the admissibility of evidence for an abuse of discretion and will not reverse unless it is established that the "court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.) Here, two of the knives recovered from the defendant shortly after the stabbing attack were similar to the victim's description of the weapon. The trial court considered defendant's argument that none of the knives found matched all of the characteristics described by the victim, but nonetheless found the knife evidence[7] had "some relevancy" and that the defendant could cross-examine the officer at trial regarding whether a determination had been made that any of the knives found on defendant was the weapon used.

Although it was not conclusively established that any of the knives recovered from the defendant was the actual weapon, two of them shared characteristics with the weapon the victim described. They were relevant as it was possible one of them was the weapon used. (*People v. Carpenter* (1999) 21 Cal.4th 1016, 1052 ["Although the witnesses did not establish the gun necessarily was the murder weapon, it might have been. . . . The evidence was thus relevant and admissible as circumstantial evidence that he committed the charged offenses"].)

Defendant argues the knives were not relevant because the People did not claim any of the knives found was used in the attack. Defendant

---

[7] Knife evidence refers to the four knives recovered from the defendant and used at trial.

15

overstates the People's position. During the motion in limine hearing, the prosecutor stated, "I'm not prepared to stipulate they weren't the knives, just there was no conclusive determination they were. . . . [C]ertainly, the fact that he had two knives matching the description of the knife used . . . is relevant." Defendant argues the prosecutor conceded in closing argument that there was no evidence any of the knives recovered from defendant was used in the attack. In closing argument, the prosecutor argued that defense counsel's questioning of the police officers regarding the process of collecting the knives and whether they were tested for DNA was a red herring because "nobody got up here and claimed these knives were used in the assault." This statement in the prosecutor's closing argument commented on the evidence at trial and is not a basis to reverse the trial court's earlier decision to admit the knife evidence. (*People v. Fruits* (2016) 247 Cal.App.4th 188, 208 (*Fruits*) ["In determining whether the trial court abused its discretion, we must focus on what the court was made aware of at the time it ruled on the motion, not on evidence that came out or circumstances that took place during trial. 'To do otherwise would require us to hold the trial court to an impossible standard' "].)

Here, the People argued the knives found on defendant at the time of his arrest hours after the attack were relevant, in part, because two of the knives shared characteristics with the description provided by the victim. At trial, Officer Cadaret testified he showed the victim the photographs of the knives only after the victim's testimony that he thought the red he saw could have been his blood. At that point, the victim told the officer one of the knives was similar but "he did not believe" it was the knife used. The prosecutor commented on this testimony in closing argument to discount the evidence collection issues raised by defendant. This argument, following

16

evidence developed during trial testimony, does not make the trial court's evidentiary ruling on the motion in limine erroneous.

Defendant relies upon *People v. Barnwell* (2007) 41 Cal.4th 1038 and *People v. Archer* (2000) 82 Cal.App.4th 1380 (*Archer*) in support of his argument that the knives were not relevant because they were not used in the assault. Both cases are distinguishable. In *Barnwell*, the Supreme Court found the trial court committed harmless error in admitting evidence that approximately a year prior to the charged murder, the defendant possessed a firearm that the facts reasonably demonstrated could not have been the murder weapon. (*Id*. at p. 1044.) The murder weapon had been found at the scene, and a police officer had witnessed the shooting. (*Id*. at pp. 1042–1043.) The Supreme Court stated: "When the prosecution relies on evidence regarding a specific type of weapon, it is error to admit evidence that other weapons were found in the defendant's possession, for such evidence tends to show not that he committed the crime, but only that he is the sort of person who carries deadly weapons." (*Id*. at p. 1056.) Further, the trial court admitted the evidence specifically to demonstrate the defendant's " '*propensity* to own or carry that type of weapon.' " (*Ibid*.) The Supreme Court concluded that the admission of evidence regarding the defendant's prior gun possession was error "[b]ecause the prosecution did not claim the weapon found by Officer Flores [a year prior to the murder] was the murder weapon." (*Ibid*.) Here, in contrast, although the prosecutor did not conclusively determine whether any of the knives recovered was used in the assault, the evidence established similarities between the victim's description of the knife used and two of the knives recovered. Thus, it was possible one of the knives, found on the defendant only hours after the attack, might have been the weapon used. (*People v. Carpenter*, *supra*, 21 Cal.4th at p. 1052 [no

17

error in admitting evidence that defendant possessed gun that might have been murder weapon].)  The fact that after the motion in limine hearing Officer Cadaret testified at trial that the victim (a year after the assault in which he "glimpsed" the knife) told him that one of the knives found on the defendant "was similar in blade length and the fact that it had holes . . . but he did not believe it was the knife [used in the attack]" goes to the weight of the evidence rather than its admissibility.

In *Archer*, *supra*, 82 Cal.App.4th 1380, the defendant objected to the relevance of nine knives recovered from his yard, bedroom, workshop, and storage locker over a year after the victim's murder.  (*Archer*, at pp. 1384, 1392.)  A codefendant testified that one of the knives resembled the knife used in the stabbing of the victim.  (*Id.* at p. 1392.)  Another knife tested positive for blood.  (*Ibid.*)  The court found that "[a]dmission of the knives *other than the two which had some arguable relevance* to the case created a risk of" an inference that defendant is the kind of person who surrounds himself with deadly weapons and that the trial court had abused its discretion in overruling defendant's objection.  (*Id.* at p. 1393, italics added.)  Here, the knives were found only hours after the attack and two of them shared characteristics with the victim's description of the knife used in the attack.  *Archer* acknowledges relevance in such circumstances.  (*Id.* at pp. 1392–1393.)

Nor did the trial court err by finding the evidence was not unduly prejudicial under Evidence Code section 352.  "Evidence is not inadmissible under [Evidence Code] section 352 unless the probative value is ' "substantially" outweighed by the probability of a "substantial danger" of undue prejudice.' " (*Fruits*, *supra*, 247 Cal.App.4th at p. 205.)  " ' " ' "The 'prejudice' referred to in Evidence Code section 352 applies to evidence which

18

uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues." ' " ' " (*Ibid.*)

We agree with the trial court that the evidence was relevant, and we do not find a substantial danger of undue prejudice. The jury heard testimony from Officer Cadaret that the victim said he "did not believe" any of the knives were used. In addition, defendant did not dispute that he stabbed the victim. Further, the evidence does not " ' " ' "uniquely tend[] to evoke an emotional bias against the defendant as an individual." ' " ' " (*Fruits*, *supra*, 247 Cal.App.4th at p. 205.) As the defendant testified, each knife he carried had a separate use. He used one folding knife for cutting food and one for cutting insulation at work, and he used the multitool knife for its utility tools. We find the probative value of the knives found on the defendant when he was arrested several hours after the attack was not " ' "substantially" outweighed by [a] probability of a "substantial danger" of undue prejudice.' " (*Fruits*, at p. 205.)

### III.   No Prosecutorial Misconduct

Defendant argues the prosecutor committed misconduct during closing argument by (1) arguing that it was defendant's burden to convince jurors his self-defense claim was true and (2) misstating the law regarding jury deliberations on attempted murder and the lesser included offense of attempted voluntary manslaughter under CALCRIM No. 3517. Defendant acknowledges he did not object below to the prosecutor's alleged misstatements but argues that his trial counsel was ineffective in failing to object. We find the prosecutor did not commit misconduct during closing argument and therefore defendant's trial counsel was not ineffective for failing to object to the prosecutor's statements.

19

## A. *Self-defense Comments*

Defendant asserts that the prosecutor misstated the law during closing argument by suggesting that it was defendant's burden to convince the jury of the truth of his self-defense claim. Defendant acknowledges that the jury was properly instructed with CALCRIM No. 3470[8] and CALCRIM No. 604,[9] which state the People have the burden of proving beyond a reasonable doubt that the defendant did not act in lawful self-defense or imperfect self-defense. Although the prosecutor never discussed the burden of proof in the context of the self-defense claim, defendant argues she stated 10 times that self-defense depends on whether the jury believed defendant's version of the incident.[10]

"Advocates are given significant leeway in discussing the legal and factual merits of a case during argument. [Citation.] However, 'it is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its . . . obligation to overcome reasonable doubt on all elements [citation].' " (*People v. Centeno* (2014) 60 Cal.4th 659, 666 (*Centeno*).) "When attacking the prosecutor's

---

[8] The jury was instructed: "The People have the burden of proving beyond a reasonable doubt that the defendant did not act in lawful self-defense. If the People have not met this burden, you must find the defendant not guilty of Counts 1 and 2, the lesser included offenses, and the enhancements." (CALCRIM No. 3470.)

[9] The jury was instructed: "The People have the burden of proving beyond a reasonable doubt that the defendant was not acting in imperfect self-defense. If the People have not met this burden, you must find the defendant not guilty of attempted murder." (CALCRIM No. 604.)

[10] Examples of the prosecutor's statements include: "So if you buy the defendant's complete self-defense story, then he's not guilty of anything"; "[R]eally with these two witnesses it's credibility and who do you believe"; "You'd have to believe all of that to believe his self-defense claim and it doesn't make sense and it's not reasonable."

remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation] there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*Centeno*, at p. 667.)

The prosecutor's argument, which characterized the defense theory of self-defense as not credible based on the evidence, was not improper. (*Centeno*, *supra*, 60 Cal.4th at p. 672 ["It is permissible to argue that the jury may reject impossible or unreasonable interpretations of the evidence and to so characterize a defense theory"].) The prosecutor did not argue the defendant had the burden of proof or that the prosecutor's burden was less than proof beyond a reasonable doubt. The jury was properly instructed by the court that the prosecutor had the burden of proving beyond a reasonable doubt that the defendant was not acting in self-defense. Defense counsel also argued in closing, "It is also [the People's] job to prove that this was not in self-defense by a reasonable doubt. It is their burden of proof beyond a reasonable doubt this was not self-defense." We find that in the context of the whole argument and the instructions there was not "a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner." (*Centeno*, at p. 667.)

### B. *CALCRIM No. 3517 Comments*

Prior to closing arguments, the jury was instructed with CALCRIM No. 3517.[11] The prosecutor argued in closing: "So, for the lesser included offense,

___

[11] The jury was instructed: "If all of you find that the defendant is not guilty of a greater crime, you may find him guilty of a lesser crime, if you are convinced beyond a reasonable doubt that the defendant is guilty of that

21

lesser crime.  A defendant may not be convicted of both a greater and lesser crime for the same conduct.

"Count 1 has a lesser included offense of Attempted Voluntary Manslaughter.

"Count 2 has a lesser included offense of Simple Assault.

"It is up to you to decide the order in which you consider each crime and the relevant evidence, but I can accept a verdict of guilty of a lesser crime only if you have found the defendant not guilty of the corresponding greater crime.

"For the count in which a greater and lesser crime is charged, you will receive verdict forms of guilty and not guilty for the greater crime and also verdict forms of guilty and not guilty for the lesser crime.  Follow these directions before you give me any completed and signed, final verdict form. Return any unused verdict forms to me, unsigned.

"1. If all of you agree the People have proved that the defendant is guilty of the greater crime charged in Counts 1 and/or 2, complete and sign the verdict form for guilty of that crime.  Do not complete or sign any other verdict form for that count.  You must consider each greater crime separately.

"2. If all of you cannot agree whether the People have proved that the defendant is guilty of the greater crime, inform me only that you cannot reach an agreement and do not complete or sign any verdict form for that count.

"3. If all of you agree that the People have not proved that the defendant is guilty of the greater crime and you also agree that the People have proved he is guilty of the lesser crime or attempted voluntary manslaughter, and/or simple assault, complete and sign the verdict form for not guilty of the greater crime and the verdict form for guilty of the lesser crime.

"4. If all of you agree the People have not proved that defendant is guilty of the greater or lesser crime, complete and sign the verdict form for not guilty of the greater crime and the verdict form for not guilty of the lesser crimes.

"5. If you all agree the People have not proved that the defendant is guilty of the greater crime, but you cannot agree on a verdict for the lesser crime, complete and sign the verdict form for not guilty of the greater crime and inform me only that you cannot reach an agreement about the lesser crimes.

"Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt unless I specifically tell you otherwise."  (CALCRIM No. 3517.)

22

the instruction, 3517, it's very long and can be hard to follow, but take a look at it because it does explain this to you in great detail. That instruction tells you that first you're looking at whether he's guilty of attempted murder. And if you find him guilty of attempted murder, you're going to use this verdict form. It's probably the biggest one and it has guilty of attempted murder. And then once you fill that in, then you move on to whether the allegation of premeditation is true or not and whether the great bodily injury and deadly weapon enhancements were true and proven. [¶] If you look at the attempted murder charge though and you can't decide amongst you if he's guilty of attempted murder or not, it means that you're hung on that count. You don't move on to the lesser at that point. You tell us you're hung on that count, we don't know what to do, and you don't look at the lesser, you don't look at the enhancements, you don't look at the special allegations, you don't fill out any forms on this count. It's only if you take this form and fill it out saying he's not guilty of attempted murder, then you'd move on to whether he's guilty or not guilty of the lesser offense."

Defendant argues that the prosecutor's comments incorrectly informed the jury that it could not consider the lesser include offense of attempted voluntary manslaughter unless it first reached a not guilty verdict on the attempted murder charge. (See *People v. Kurtzman* (1988) 46 Cal.3d 322, 324–325 [jury is restricted from returning a verdict on a lesser included offense before acquitting on a greater offense, but is not precluded from considering lesser offenses during its deliberations].) We disagree.

The jury was properly instructed by the court that "[i]t is up to you to decide the order in which you consider each crime and the relevant evidence, but I can accept a verdict of guilty of a lesser crime only if you have found the defendant not guilty of the corresponding greater crime." (CALCRIM No.

23

3517.) In closing argument, the prosecutor did not state the jury was prohibited from considering the lesser offense or deliberating on it. In fact, she told the jury to "take a look at [CALCRIM No. 3517] because it does explain this to you in great detail." The prosecutor's further comments regarding returning the various verdict forms are in line with the court's instruction that it cannot "accept a verdict of guilty of a lesser crime [unless] you have found the defendant not guilty of the corresponding greater crime" and do not constitute misconduct.

## IV. Sufficient Evidence Supports Finding of Premeditation and Deliberation

Defendant argues there was insufficient evidence to support the jury's finding of premeditation and deliberation.[12] We disagree.

" ' "[P]remeditated" means "considered beforehand" and "deliberate" means "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action." ' [Citation.] 'An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.' [Citation.] A reviewing court normally considers three kinds of evidence to determine whether a finding of premeditation and deliberation is adequately supported—preexisting motive, planning activity, and manner of killing—but '[t]hese factors need not be present in any particular combination to find substantial evidence of premeditation and deliberation.' " (*People v. Jurado* (2006) 38 Cal.4th 72, 118–119.)

---

[12] The jury found true the allegation that the attempted murder was committed willfully, deliberately, and with premeditation within the meaning of section 189. Defendant challenges the sufficiency of the evidence regarding the deliberation and premeditation findings only.

" 'The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder.' " (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

We find sufficient evidence supports the jury's finding of premeditation and deliberation. First, there was evidence of past disputes between the victim and the defendant regarding payment for Dash's care and how the victim cared for Dash, including an angry text message in which the defendant told the victim, "Get your own dog, or kill yourself. I don't care," and another message in which the defendant called the victim a "lunatic." From this evidence the jury could have reasonably concluded the defendant wanted to kill the victim because of their past disputes. Second, there was evidence of planning. The defendant brought knives to the victim's home and then waited nearly three hours before attacking the victim. When the victim turned his back and was in a vulnerable position, the defendant began his attack by hitting the victim in the head with a rock and then stabbed him repeatedly. (See *People v. Sanchez* (1995) 12 Cal.4th 1, 34 [planning activity may occur over a short period of time], disapproved on other grounds in

*People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) In addition, the manner of the attempted killing further supports the jury's finding. Defendant stabbed the victim eight times in the neck and chest. Even once the victim was able to get control of defendant and told him to drop the knife, the defendant refused. Based upon this record, a rational trier of fact could find beyond a reasonable doubt that the defendant acted with premeditation and deliberation.

### V. Sentencing

On count one, the defendant was sentenced to prison for seven years to life for attempted murder plus a determinate sentence of three years for the great bodily injury enhancement and one year for the use of a deadly and dangerous weapon enhancement. On count two the defendant was sentenced to four years plus three years for the great bodily injury enhancement and the time imposed was stayed under section 654. Defendant's overall prison sentence was seven years to life consecutive to a determinate term of four years.

Defendant argues the seven years to life sentence is unauthorized and must be corrected to life with the possibility of parole because section 664 states: "[I]f the crime attempted is willful, deliberate, and premeditated murder, as defined in Section 189, the person guilty of that attempt shall be punished by imprisonment in the state prison for life with the possibility of parole." (§ 664, subd. (a).) Defendant relies on a footnote in *People v. Wong* (2018) 27 Cal.App.5th 972 which notes the trial court and the parties referred to the sentence by a "common shorthand" including the minimum parole eligibility period but that "a more accurate statement of the sentence for attempted murder is simply 'life, plus' any determinate enhancements." (*Id.* at pp. 977–978, fn. 4.) At issue in *Wong* was whether the defendant had been

26

improperly sentenced to three consecutive one-year terms for deadly weapons enhancements on a single attempted murder count. (*Wong*, *supra*, at p. 978.) *Wong* does not address whether a sentence of seven years to life for attempted murder is unauthorized and must be corrected, and we do not find it persuasive authority for defendant's position here.

The People argue there is no sentencing error because although section 664, subdivision (a) provides the punishment for attempted premeditated murder is "life with the possibility of parole," defendant cannot be paroled under section 3046 until he has served "at least seven calendar years" in prison. (§ 3046, subd. (a)(1).) *People v. Jefferson* (1999) 21 Cal.4th 86 (*Jefferson*) addressed a related issue regarding doubling of the minimum term for attempted premeditated murder under section 667, subdivision (e)(1) (the "Three Strikes" law). (*Jefferson*, at pp. 91–92.) The California Supreme Court stated: "Defendants insist that the sentence for attempted premeditated murder does not have a minimum term, because section 664, the relevant penalty provision, does not mention service of any minimum term, stating only that the punishment is 'imprisonment in the state prison for life with the possibility of parole.' But as we have explained, the minimum term for a defendant found guilty of attempted premeditated murder is found not in section 664 but in section 3046. The parole eligibility period set by section 3046 *is* a minimum term within the sentence-doubling language of section 667(e)(1)." (*Jefferson*, at p. 96.) *Jefferson* also noted there was nothing improper about the trial court's including the minimum term established by section 3046 in its oral pronouncement of the sentence. "By including the minimum term of imprisonment in its sentence, a trial court gives guidance to the Board of Prison Terms regarding the appropriate term to apply, and it informs the victims attending the sentencing hearing of the

27

minimum period the defendant will have to serve before becoming eligible for parole.  Thus, when the trial court here pronounced defendants' sentences, it properly included their minimum terms . . . ." (*Id.* at p. 102, fn. 3.)

Defendant argues *Jefferson* is distinguishable because there is no "sentence doubling" issue here.  We do not find this to be a meaningful distinction given *Jefferson*'s statements that the seven-year parole eligibility period is the minimum term for attempted premeditated murder and that the trial court "properly included their minimum terms."[13]  (*Jefferson*, *supra*, 21 Cal.4th at pp. 96, 102, fn. 3.)  We conclude the trial court did not err.

## DISPOSITION

The judgment is affirmed.

---

[13] Although we do not find the trial court's seven-years-to-life sentence erroneous given that section 3046 provides seven years is the minimum period that must be served before parole eligibility for attempted murder, the better practice is to follow the language of section 664, which provides the sentence for attempted murder is "life with the possibility of parole."  (§ 664, subd. (a).)

28

_____
Jackson, J.

WE CONCUR:


_____
Siggins, P. J.


_____
Fujisaki, J.

A155630/*People v. Quentin Bowen*

A155630/People v. Quentin Bowen

Trial Court:        Superior Court of the County of Sonoma

Trial Judge:        Peter Ottenweller, J.

Counsel:            Stephen Greenberg, under appointment by the Court of
                    Appeal, for Defendant and Appellant.

                    Xavier Becerra, Attorney General, Lance E. Winters, Chief
                    Assistant Attorney General, Jeffrey M. Laurence,
                    Senior Assistant Attorney General, Catherine A.
                    Rivlin and Ann P. Wathen, Deputy Attorneys General,
                    for Plaintiff and Respondent.