Filed 8/26/25  P. v. Rodriguez CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DAVID RODRIGUEZ and ANDREW MICHAEL SHINAIA,<br><br>    Defendants and Appellants. | B336607<br><br>(Los Angeles County Super. Ct. No. VA156827) |


APPEAL from a judgment of the Superior Court of Los Angeles County, Joseph R. Porras, Judge.  Affirmed with modification.

Corey J. Robins, under appointment by the Court of Appeal, for Defendant and Appellant, David Rodriguez.

Julie Caleca, under appointment by the Court of Appeal, for Defendant and Appellant, Andrew Michael Shinaia.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, and Gary A. Lieberman, Deputy Attorney General, for Plaintiff and Respondent.

\* \* \* \* \* \*

Defendant David Rodriguez (Rodriguez) drove defendant Andrew Michael Shinaia (Shinaia) into rival gang territory seeking to avenge the recent killing of Shinaia's brother. Rodriguez pulled up alongside a car, and Shinaia issued a gang challenge and then opened fire on the car; the driver was killed, and the passenger survived. A jury convicted Shinaia of first-degree murder of the driver and attempted murder of the passenger, and convicted Rodriguez of second-degree murder of the driver. Defendants attack their convictions on a variety of grounds, none of which has merit. Shinaia attacks his sentence, asserting that the trial court erred in imposing a sentence of seven years to life for premeditated attempted murder rather than a sentence of life with the possibility of parole. This argument has merit. Accordingly, we affirm defendants' convictions, and order Shinaia's sentence to be modified.

2

# FACTS AND PROCEDURAL BACKGROUND

## I. Facts

### A. *Territorial rivalry between Florencia 13 and Morton Town Stoners gangs, and defendants' gang membership*

Florencia 13 is a well-established Hispanic gang in Los Angeles County founded in the 1950s. Florencia 13's territory borders the territory of a different Hispanic gang, the Morton Town Stoners, along Nadeau Street. Florencia 13 and the Morton Town Stoners are rivals.

Shinaia and Rodriguez are members of the "85th Street" clique of the Florencia 13 gang. Both of them have several gang-related tattoos; Rodriguez had "MK"—short for "Morton Killer"—tattooed above his left eye.

### B. *Shinaia's brother is gunned down along the Morton Town Stones border*

Shinaia had a twin brother named Hector. Hector also belonged to the 85th Street clique and went by the moniker "Little Largo." On November 23, 2020, Hector was gunned down while in a car driving on Nadeau Street. After Hector's death, Shinaia got "RIP Hector" tattooed on his left temple, and Rodriguez got "Little Largo RIP" tattooed above his right eye.

### C. *Defendants "hit up" people inside Morton Town gang territory and shoot at a car*

A little after 4 p.m. on the afternoon of August 5, 2021, Rodriguez and Shinaia recorded a video on the phone Rodriguez and his girlfriend used that depicted Shinaia holding what appeared to be two semiautomatic pistols.

Approximately one hour later, Rodriguez drove a sedan into Morton Town gang territory with his girlfriend as the front

3

passenger and Shinaia in the back seat. As they drove, they were "nozzing"—that is, inhaling nitrous oxide gas.

Rodriguez drove up alongside a man parking his car, and Shinaia asked if he "gang-bang[ed]." When the man said he did not, Rodriguez drove away.

Moments later, Rodriguez pulled up alongside a white Lexus stopped at a stop sign. Juan Ochoa was its driver; Tony Vela, the front seat passenger. From the back seat, Shinaia asked the men in the Lexus where they were from, which is a classic gang challenge. Although Ochoa and Vela responded that they were not gang members, Shinaia did not believe them and proclaimed, "There's the enemy." Shinaia then yelled "Florence" and fired three shots at the Lexus. Rodrigeuz then sped away.

One of the bullets struck Ochoa in the head, killing him. The bullet recovered from the scene bore "the exact same head stamp" as a bullet depicted in a video Rodriguez recorded four days prior on his cell phone.

Less than two hours after the shooting, Shinaia and Rodriguez returned to the area. They recorded a video depicting the very intersection where the shooting occurred, and played a song in the background cued to the lyrics, "You all know who shot your man. Yeah, we definitely did it."

Cell phone tower evidence placed this shared cell phone in the area before, during, and after the shooting.

**D.** *Shinaia's admission and jailhouse calls*

On September 25, 2021, a law enforcement officer who had known Shinaia for years and knew that his brother Hector had been shot expressed his condolences to Shinaia while transporting him. Shinaia "effect[ively]" responded, "It's been taken care of."

A few days later, on September 27, 2021, a deputy sheriff visited Shinaia in jail and, as a ruse, told him she was investigating a hit-and-run accident because Rodriguez had collided the sedan used in the shooting with another vehicle a few hours after the shooting, and then abandoned it. Shinaia made several in-custody calls soon thereafter. In two of those calls, Shinaia stated, "They got me." On one call, he stated that he "should have known that [Rodriguez] is a snitch." In several instances, Shinaia indicated that he "did it" for "the hood": On one call, he said, "At the end of the day, you know who I did it for—I don't give a fuck . . . . On the hood. I don't car[e]"; on another, he said, "I had it coming . . . it's regular . . . on the hood"; and on yet another, he said, "I told [Hector], dick, if we—we choose this life, dick, no matter what, . . . , we're going to have to learn the hard way, fool, on the hood . . . . And I think that we came out solid . . . . Look, how people say how we did it for the hood, . . . , we did it for the hood . . . . Look, my brother passed away for the hood, . . . and I'm over here." When a woman on the other end of the line in response to the final comment stated, "But, you didn't do it for the hood, you did it for your brother[,]" Shinaia responded, "Yeah . . . it's stupid as fuck."

## II. Procedural Background

In the operative first amended information, the People charged Shinaia and Rodriguez with (1) the murder of Ochoa (Pen. Code, § 187, subd. (a));[1] (2) the attempted murder of Vela (§§ 664, 187, subd. (a)); and (3) conspiracy to commit murder (§§

---

1  All further statutory references are to the Penal Code unless otherwise indicated.

5

182, subd. (a)(1), 187, subd. (a)).[2]  As to all three counts, the People alleged that Shinaia personally used a firearm (§ 12022.5, subd. (a)).  As part of a later, unrelated incident, defendants were also charged with robbery (§ 211).  Defendants pled no contest to the robbery count prior to trial.

The matter proceeded to trial.  Defendants did not testify or present any evidence.

The jury convicted Shinaia of the first degree murder of Ochoa and the attempted murder of Vela, and found true the personal use of a firearm allegation.  The jury convicted Rodriguez of the second degree murder of Ochoa, but acquitted him of the attempted murder of Vela.  The jury acquitted both defendants of conspiracy to commit murder.

The trial court sentenced Rodriguez to prison for 18 years to life, comprised of a mid-term sentence of three years for the robbery, plus a consecutive term of 15 years to life for the murder.  The trial court sentenced Shinaia to prison for 43 years to life, comprised of a mid-term sentence of three years for the robbery, plus a consecutive term of 25 years to life for first degree murder, plus a consecutive mid-term sentence of four years for the firearm enhancement, plus a consecutive term of seven years to life for attempted murder, plus a consecutive mid-term sentence of four years for the firearm enhancement.

Defendants filed timely notices of appeal.

---

[2]     The People further alleged multiple aggravating factors pursuant to California Rules of Court, rule 4.421, but later elected not to proceed with them.

# DISCUSSION

## I.  Instructional Error

Rodriguez argues that the trial court erred in not instructing the jury on the lesser-related offense of being an accessory after the fact (§ 32) to Ochoa's murder.[3]  We review claims of instructional error de novo.  (*People v. Guiuan* (1998) 18 Cal.4th 558, 569-570.)

### A.  *Pertinent facts*

During a discussion on jury instructions, counsel for Rodriguez stated, "I did want to add a lesser PC 32.  I think it's appropriate."  The trial court believed it was "a separate charge" and not "an actual lesser" but agreed to look at the law.  The court subsequently returned to the "issue" of whether "PC . . . 32" was "a potentially . . . lesser included" offense, and reported that it "could not find anything that showed that Penal Code section 32 was a lesser of either murder, attempted murder or conspiracy."  The court asked if either counsel for Rodriguez or the People had "found anything that would include [§ 32] as a lesser"; both responded that they had not.  The court declined to instruct on accessory after the fact.

### B.  *Pertinent law*

"A trial court has a duty to instruct on general principles of law that are 'closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the

---

**3**     Section 32 states: "Every person who, after a felony has been committed, harbors, conceals or aids a principal in such felony, with the intent that said principal may avoid or escape from arrest, trial, conviction or punishment, having knowledge that said principal has committed such felony or has been charged with such felony or convicted thereof, is an accessory to such felony."

case.'" (*People v. Moye* (2009) 47 Cal.4th 537, 554, quoting *People v. Montoya* (1994) 7 Cal.4th 1027, 1047.) As part of that duty, a trial court must instruct a jury on any crimes that are necessarily included within a charged crime (so-called "lesser-included" offenses) if there is substantial evidence that the defendant committed the lesser-included offense but not the charged crime. (*People v. Gonzalez* (2018) 5 Cal.5th 186, 196.) However, the duty to instruct does not extend to lesser-*related* crimes unless the prosecutor *consents* to the jury being instructed on that offense. (*People v. Birks* (1998) 19 Cal.4th 108, 136-137 (*Birks*); *People v. Hicks* (2017) 4 Cal.5th 203, 211; *People v. Rangel* (2016) 62 Cal.4th 1192, 1230.) Even if the prosecutor consents, a trial court still retains discretion whether to instruct on a lesser-related offense. (*People v. Hall* (2011) 200 Cal.App.4th 778, 783; see *Birks*, at p. 131.) This distinction between lesser-included and lesser-related offenses is grounded in the separation of powers: When the People charge a crime, that charging decision necessarily encompasses all lesser-*included* crimes to the charged crime; because lesser-*related* crimes are outside this charging decision, granting defendants the right to have the jury instructed on lesser-related crimes over the prosecutor's objection risks impinging on prosecutorial discretion entrusted to the executive branch. (*Birks*, at pp. 134-135; *Hicks*, at p. 211.)

Because the offense of being an accessory after the fact is a lesser-related offense to murder, not a lesser-included offense (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 486), the trial court did not err in declining to instruct on this offense because (1) Rodriguez never asked for a lesser-*related* instruction (as he only asked for this instruction as a lesser-*included* offense); (2)

8

the People did not consent to this instruction; and (3) the trial court was not obligated to give this instruction even if the prosecutor *had* consented.

Rodriguez responds with what boils down to four arguments.

First, he argues that the People "never expressly objected" to his request for a lesser-related instruction. We reject this argument. Because Rodriguez never asked for the jury to be instructed on the crime of being an accessory after the fact as a lesser-*related* instruction, the People cannot be faulted for failing to object to a request that was never made. And even if we were to construe Rodriguez's ambiguous request for a "lesser" instruction as encompassing a request that the instruction was "lesser-related" as well as "lesser-included" (as Rodriguez urges the trial court should have done), the People informed the court that they had found no authority for such an instruction. A prosecutor's statement to the effect of, "You don't have authority for that instruction" is not equivalent to consent.

Second, Rodriguez claims the trial court "failed to recognize [Penal Code section 32] was a lesser-related offense" and that it failed to engage in a "lesser-related analysis." Given the default presumption that we must presume from a silent record that the trial court is aware of the applicable law and given the parties' agreement that there was no basis for the instruction, we cannot presume error where the record does not establish on its face that the trial court misunderstood the law. (*People v. Gutierrez* (2009) 174 Cal.App.4th 515, 527.)

Third, Rodriguez essentially asks us to ignore *Birks* because (1) the prosecutor introduced evidence at trial in support of the conspiracy charge that could be used to support an

accessory after the fact conviction (and hence amounts to an implicit consent to the lesser-related instruction), (2) the jury was otherwise left with an "all or nothing choice," and (3) the application of *Birks*' rule requiring prosecutorial consent to a lesser-related instruction requires a more "nuanced" analysis as to whether the policy underlying *Birks* is implicated in a particular case. We decline to construe a prosecutor's decision to elicit evidence relevant to a charged offense as implicit consent to the giving of a lesser-related instruction. Doing so would create an unauthorized exception to *Birks*, and we are in no position to overrule our Supreme Court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455-456.) The jury was not faced with an all-or-nothing choice; the jury had the option of convicting Rodriguez of second degree murder as opposed to first degree murder, and did in fact choose that option. And Rodriguez's request that *Birks*'s rule can be ignored based on case-specific policy balancing is a request to overrule *Birks*; as noted above, we cannot do that.

Fourth and lastly, Rodriguez cites sections 1127 and 1093, subdivision (f), both of which deal with a trial court's general duty to instruct on that law; they are accordingly irrelevant.[4]

## II.    Evidentiary Errors

Defendants raise two challenges to the trial court's evidentiary rulings. We review such rulings for an abuse of discretion. (*People v. Mataele* (2022) 13 Cal.5th 372, 413.)

---

[4]    We do not address Rodriguez's argument that counsel was ineffective for failing to ask for a lesser related instruction because we have assumed for purposes of our analysis that Rodriguez made such a request, and still find no error.

10

### A. *Admission of gang evidence*
#### 1. *Pertinent facts*

Prior to trial, Rodriguez filed a motion in limine to completely exclude or strictly limit evidence of his and Shinaia's involvement in criminal street gangs, arguing it was "inflammatory and not relevant" because "[n]o gang enhancement or gang charge" was alleged against defendants. The People responded that gang evidence was relevant to prove defendants' motive and intent for the shootings. The trial court denied the motion in part, reasoning that it would "allow a limited amount of motive testimony" because the shootings had a "joint motive" of avenging Hector's death as well as avenging the death of a fellow Florencia 13 gang member.

At trial, several law enforcement officers testified to having gang enforcement duties or explained gang-related slang and terminology and a gang expert testified on gang terminology, the meaning of defendants' tattoos, and the significance of videos and photographs found on Rodriguez's cell phone. Following this testimony, the trial court indicated it was aware of defendants' continuing objection to the gang expert's testimony, and found that everything the expert testified to was within the court's ruling.

At the conclusion of the trial, the court instructed the jury that it could "consider evidence of gang activity only for the limited purpose of deciding whether . . . [t]he defendants had a motive to commit the crimes charged"—but "not . . . for any other purpose," including to find that either defendant was a person of "bad character" or who had a "disposition to commit crime."

### 2. *Pertinent law*

Even when a gang enhancement is not charged in a particular case, "gang evidence . . . may still be relevant and admissible to prove other facts related to a [charged] crime," including motive and specific intent. (*People v. Tran* (2022) 13 Cal.5th 1169, 1208; *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.) However, because "gang membership evidence does create a risk the jury will impermissibly infer a defendant has a criminal disposition and is therefore guilty of the offense charged" (*People v. Montes* (2014) 58 Cal.4th 809, 859), trial courts must be cognizant of that risk when assessing, under Evidence Code section 352, whether the probative value of the evidence is substantially outweighed by the probability that its admission will create a substantial danger of undue prejudice.

### 3. *Analysis*

The trial court did not abuse its discretion in admitting the gang-related evidence in this case. That evidence was limited to the shooting of Hector in disputed gang territory, defendants' membership in the gang, the history and motivation of the Florencia 13 gang and its rivalry with Morton Town Stoners, defendants' tattoos reflecting affiliation with that gang alongside tattoos commemorating Hector's death, defendants' conduct in issuing gang challenges before the shooting as well as shouting "Florence" during the shooting, Shinaia's post-shooting jailhouse calls indicating that his acts were for "the hood," and gang expert testimony explaining the pertinent terms and practices of gang culture. Although, as defendants assert on appeal, they could have gunned down Ochoa solely in retribution for Hector's death, the gang evidence provided a second motive for the shootings—to exact revenge on those they believed to be members of the rival

12

gang that killed Hector in order to assert their gang's dominance and earn respect. The gang evidence therefore provided a second motive for the shootings—and thus further reason for defendants to act with the specific intent to kill. That evidence was accordingly quite probative to the contested element of intent. Nor was this substantial probative value substantially outweighed by the danger of unfair prejudice. In this context, unfair prejudice means more than that the evidence at issue is "damaging" to a defendant; it means that the evidence is unfairly or unduly inflammatory because it "evoke[s] an emotional bias." (*People v. Karis* (1988) 46 Cal.3d 612, 638; *People v. Branch* (2001) 91 Cal.App.4th 274, 286; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1369.) In light of the graphic nature of the crime itself (shooting the non-aggressive Ochoa in the head), the introduction of evidence regarding the background and motives of the Florencia gang was not unduly inflammatory or emotional.

On appeal, defendants point to eight specific items of gang testimony that the trial court erred in admitting. We conclude there was not prejudicial error.

First, defendants assert that the court should not have allowed Detective Gutierrez to testify, in her prefatory remarks explaining how she seized the cell phone containing several videos and images, that she was "on loan to [the] gang impact team" and "investigating an individual named David Rodriguez" on the day *before* the shooting. No one objected to this prefatory comment about her assignment or her investigation and this is not "gang evidence," so this argument has been forfeited. (Evid. Code, § 353; *People v. Jackson* (2016) 1 Cal.5th 369, 366-367.) It also lacks merit, as Detective Gutierrez's remarks were relevant to explain why she was following and "pinging" Rodriguez's

phone prior to the shooting, and were in no way prejudicial because she never mentioned what she was investigating.

Second, defendants contend that the court erred in allowing Officer Palacios to testify that Palacios had previously told Shinaia that Shinaia was going to "spend life in jail" if he continued with "gang-related activity." This testimony was elicited by *Shinaia*, so he cannot object to it now. (See *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1138-1139 [defense counsel's cross-examination questions on a topic invited any error, barring his appellate challenge].) This was also not "gang evidence" insomuch as it was "life advice." In any event, this testimony was duplicative of Shinaia's own words on one of the jailhouse calls, where he indicated that the "cops" told him he was "going the wrong path" and was "either going to be dead or do life in jail."

Third, defendants posit that the trial court erred in admitting video and still-photo downloads from Rodriguez's cell phone that depict Rodriguez putting up and posing near gang graffiti associated with his gang clique and his gang moniker; that depict both defendants discussing "Morton Killers" or otherwise using offensive, derogatory, racist language; and that depict the hand stamping of the bullets matching the bullets used in the charged crime or Shinaia displaying what appear to be guns just an hour before the shootings. This evidence is relevant to show identity and motive, and to establish defendants' involvement in the gang, which formed the basis for the gang expert's opinions. Further, evidence of "putting spray paint on walls" and "doing [gang] hand signs" was not inflammatory when compared to the charged crimes.

14

Fourth, defendants argue that the court erred in allowing the gang expert to testify that Rodriguez had a tattoo of "MK" for Morton Killer because, as it turns out, neither Ochoa nor Vela were members of the Morton Town Stoner gang. But this evidence was probative to show Rodriguez viewed himself as a killer of those rival gang members and hence was more likely to be aware of Shinaia's intent when they drove into that rival gang territory while armed and started hitting up people they encountered. The fact that Shinaia's instinct that Ochoa and Vela were "the enemy" ended up being incorrect, and that the victims were not gang members, does not bring into question defendants' intent or motive in spoiling for an encounter.

Fifth, defendants contend that the court erred in allowing the gang expert to testify that gang members seek "respect" and "put in work" for the gang by committing crimes or by protecting their gang's territory because there was no evidence that *defendants* ever acted "for respect, or to put in work" on behalf of their gang. The record is to the contrary: The location they cruised, defendants' conduct in hitting up people they encountered, and Shinaia's proclamation that Ochoa and Vela were "the enemy" before he shouted "Florence" and opened fire all indicate that defendants were, in fact, seeking respect and putting in work for their gang by committing crimes and protecting its territory. Indeed, Shinaia on one jailhouse call said that "we did it *for the hood*." (Italics added.)

Sixth, defendants posit that the court erred in allowing the gang expert to testify to the history, territory and characteristics of Florencia 13. But this testimony was directly relevant to defendants' motive. Hector was killed near Nadeau Street, which is an area contested by Florencia 13 and Morton Town Stoners.

15

This testimony thus proffered a reason why defendants went looking for a rival gang member. The testimony also explained why defendants would create a video claiming credit for the killing just two hours after the shooting as a means of taking credit for committing a killing in rival gang territory.

Seventh, defendants argue that the court erred in allowing the gang expert to testify that he was familiar with Ochoa's brother, which defendants claim unfairly suggested that Ochoa himself was associated with Morton Town Stoners and was killed for that association. For starters, this testimony was elicited *by Shinaia*, so he has no cause to complain on appeal. More to the point, there was no error because the expert extensively testified that he was not familiar with Ochoa himself; any gang affiliation by familial link was entirely speculative and hence neither error nor prejudicial.

Eighth and lastly, both defendants agree that the court erred in allowing the gang expert to testifying about "snitching" and how gangs often retaliate against individuals who help in the prosecution of gang members. However, this testimony is relevant to bolster the credibility of both Rodriguez's girlfriend and Vela, whose testimony vacillated and who potentially put themselves at risk by testifying truthfully. Defendants assert that it is not relevant as to Rodriguez because he was not a witness in the case, but the expert's testimony is relevant because Shinaia said in one of the jailhouse calls that he believed Rodriguez to be a "snitch" and wanted to make any proof of that fact public—which shows *both* that Shinaia believed Rodriguez had incriminating information to offer law enforcement (which would be true if Rodriguez and Shinaia had planned to shoot rivals in advance) and that Shinaia had a consciousness of guilt.

16

Even if the trial court had erred in admitting any of this evidence, the jury was specifically instructed that it could consider the gang evidence only for the limited purpose of motive and the People reinforced that during closing argument. We presume jurors followed this instruction in the absence of proof to the contrary (*People v. Gonzales* (2011) 51 Cal.4th 894, 940), and there is no such proof here. The People also emphasized that instruction during closing argument, asserting the evidence proved defendants were guilty "not because they're gang members" and telling the jury to "not use the gang evidence improperly." In any event, the prosecution's case was strong, so there is no reasonable probability that the gang evidence affected the jury's verdict. (*People v. Davis* (1996) 42 Cal.App.4th 806, 813; *People v. Champion* (1995) 9 Cal.4th 879, 923.)

### B. Admission of rap lyrics

Defendants also contend that the trial court erred in admitting the video that they filmed of the intersection where Ochoa was shot a few hours after the shooting.

#### 1. Pertinent facts

As noted above, law enforcement recovered from Rodriguez's phone a video of the crime scene taken less than two hours after the shooting that contained audio that played a snippet from a song with the following lyrics: "You all know who shot your man. Yeah, we definitely did it." The People indicated its intent to introduce this video because, given the location depicted and the cued-up lyrics, it was effectively an adoptive admission (of the lyrics) as to "what ha[d] happened an hour and a half before." Shinaia sought to exclude the video as unduly prejudicial under Evidence Code section 352, but never objected under section 352.2. The trial court agreed that the audio

17

constituted an adoptive admission and ruled that the video and audio were admissible but that the audio would not be transcribed.

2.    *Analysis*

Evidence Code section 352 grants trial courts the "discretion" to exclude otherwise relevant evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  (Evid. Code, § 352.) Evidence Code section 352.2 effectively creates an overlay to this analysis for evidence that is "a form of creative expression" in two pertinent ways.  First, it dictates that the "probative value" of any "form of creative expression" "is minimal" *unless* it was (1) "created near in time to the charged crime or crimes," (2) "bears a sufficient level of similarity to the charged crime or crimes," or (3) "includes factual detail not otherwise publicly available." (Evid. Code, § 352.2, subd. (a).)  Second, it explains that "undue prejudice" "includes, but is not limited to," (1) "the possibility that the trier of fact will . . . treat the expression as evidence of the defendant's propensity for violence or general criminal disposition," and (2) "the possibility that the evidence will explicitly or implicitly inject racial bias into the proceedings." (*Ibid.*)

The trial court did not abuse its discretion in admitting the video and audio.  As a threshold matter, it is unclear whether we may apply Evidence Code section 352.2's overlay because defendants never objected on that basis, and arguably forfeited their right to insist upon its application.  (Evid. Code, § 353.)  But the court did not abuse its discretion even if we apply that

18

overlay.  The probative value of the video and audio is substantial:  The video is a recording of the scene of the shooting in the middle of their rival gang's territory, hours after it occurred, created *by the defendants* and to which they cued up the lyrics, "You all know who shot your man.  Yeah, we definitely did it."  This is powerful evidence tending to establish not only that defendants *did* the charged crimes, but that they were proud enough of it to document it for posterity.  It need not be ascribed "minimal" probative value under Evidence Code section 352.2 because it was "created near in time to the charged crime or crimes" and "bears a sufficient level of similarity to the charged crime or crimes" because it is a near-contemporaneous documentation of those charged crimes.  This probative value is not substantially outweighed by any danger of unfair prejudice because the effective admission of guilt is limited *to this crime* and thus carries little possibility of being construed as a general propensity for violence or injecting any racial bias.  In short, if the audio to the video had been defendants saying, "We did it," there would be no issue at all.  We do not view the admissibility of the video any differently if they had sung "We did it" in two-part harmony or, as happened here, they cued up someone else's song saying, "We did it."

Defendants resist this conclusion with two arguments.  First, they assert that there is no evidence or suggestion that they wrote the lyrics.  But what makes the video relevant is what the lyrics say and that defendants—by their conduct in using those lyrics as background music for the documentation of the crime scene—adopted those words as their own; who originally wrote the lyrics is utterly irrelevant.  Second, defendants cite *People v. Hin* (2025) 17 Cal.5th 401.  Although the Supreme

19

Court in *Hin* relied on Evidence Code section 352.2 to conclude that a trial court erred in admitting a creative expression, the facts of *Hin* are inapt. In *Hin*, the defendant possessed a CD with lyrics that were "graphic and violent, repeatedly describing 'blast[ing],' 'killing,' [and] 'murder[ing]]'" gang rivals, and the lyrics also included "inflammatory and irrelevant descriptions of sexualized violence." (*Hin*, at p. 480.) There was no "evidence to show that Hin was involved in the creation or production of the song or that it described any of the charged crimes." (*Id*. at p. 479.) Here, by contrast, defendants created the video and cued up the lyrics as a snappy way of saying they "did" the crime.

## III. Sufficiency of the Evidence Supporting Rodriguez's Conviction for Murder

Rodriguez contends there was insufficient evidence to support his conviction for the second degree murder of Ochoa as an aider and abettor with express malice. We review this claim for substantial evidence. In so doing, we ask whether the record—construed in the light most favorable to the verdict—contains enough evidence that is reasonable, credible, and of solid value for a reasonable trier of fact to find defendant guilty beyond a reasonable doubt. (*People v. Brooks* (2017) 3 Cal.5th 1, 57; *People v. Salazar* (2016) 63 Cal.4th 214, 242.)

Where, as here, the jury is instructed only as to murder based on express malice, a defendant can be guilty of aiding and abetting that express-malice murder only if (1) the direct perpetrator committed the crime of murder; (2) the defendant knew of the direct perpetrator's unlawful purpose to commit murder; (3) defendant, by his acts or advice, aided, promoted, encouraged, or instigated the direct perpetrator's commission of the murder; and (4) defendant acted with the intent to commit,

20

encourage or facilitate the murder—that is, with the intent to kill. (§§ 31, 188, subd. (a)(1); *People v. McCoy* (2001) 25 Cal.4th 1111, 1118.)

Substantial evidence supports the jury's verdict that Rodriguez is guilty of Ochoa's murder as a direct aider and abettor. Substantial evidence supports the jury's finding that Shinaia committed the crime of murder: Two eyewitnesses saw Shinaia open fire on Ochoa, and Shinaia repeatedly said that he "did it" on the jailhouse tapes. Substantial evidence supports the jury's finding that Rodriguez knew of Shinaia's unlawful purpose to commit murder because they videotaped Shinaia with two guns an hour before the shooting, Shinaia "hit up" the man parking his car within earshot of Rodriguez, and Rodriguez nevertheless pulled up alongside Ochoa's car where he waited for Shinaia to issue another gang challenge and open fire before driving off. Substantial evidence supports the jury's finding that Rodriguez by his acts or advice aided Shinaia's commission of the murder because he was Shinaia's wheelman. And substantial evidence supports the jury's finding that Rodriguez acted with the intent to kill—he had a tattoo dedicated to Hector's killing, he was a member of the Florencia 13 gang, he knew Shinaia was carrying a gun when they drove into Morton Town Stoners territory, and Shinaia was worried about Rodriguez being a "snitch" (which tends to show Rodriguez knew about a plan to kill gang rivals from the outset). Contrary to what Rodriguez argues in his reply brief, our conclusion in no way rests upon imputing Shinaia's intent to Rodriguez.

Rodriguez offers three arguments to the contrary.

First, Rodriguez asserts that he only had the intent to kill rival gang members (as evidenced by the fact that Shinaia did not

21

shoot the man parking his car moments before), such that Rodriguez lacked the intent to kill Ochoa, who was *not* a rival gang member. This argument assumes that murder requires the intent to kill a specific person; California law does not support that assumption. (*People v. Stone* (2009) 46 Cal.4th 131, 139 ["for murder, 'the intent to kill need not be directed at a specific person'"].) Because the implicit premise of Rodriguez's assertion is that he had the intent to kill gang rivals, and because an intent to kill *anyone* is sufficient, Rodriguez's assertion effectively concedes the existence of this element.

Second, Rodriguez contends that he did not intend to help Shinaia kill Ochoa because Rodriguez started to drive away from Ochoa's car once Ochoa denied being a gang member. We reject this contention. Although one witness testified that Rodriguez started to pull away once Ochoa denied gang membership, two other witnesses testified that Shinaia opened fire before Rodriguez drove away. It was for the jury to resolve this factual dispute (e.g., *People v. Young* (2005) 34 Cal.4th 1149, 1181), and there was ample basis for the jury to resolve it in favor of finding that Rodriguez waited for Shinaia to blast his perceived enemies before pulling away. Under substantial evidence review, we accordingly defer to the jury's resolution of this factual issue.

Third, Rodriguez argues that Shinaia's concern—expressed on the jailhouse calls—that Rodriguez might be a "snitch" means that Rodriguez is innocent because only innocent people cooperate with law enforcement. Not only is this argument divorced from reality, but it also ignores the competing and far more likely inference that Shinaia was worried about Rodriguez cooperating because Rodriguez had been part of the plan to

murder gang rivals all along and hence could provide particularly damning evidence against Shinaia.

## IV. Ineffective Assistance of Shinaia's Counsel

Shinaia contends his counsel rendered ineffective assistance during closing argument by making comments that lowered the People's burden of proof. We independently review claims of ineffective assistance of counsel. (*People v. Mayfield* (1993) 5 Cal.4th 142, 199.)

### A. *Pertinent facts*[5]

During his closing argument, Shinaia's counsel stated:

"And just you know, this is the People's case. This is Mr. Hogue's case, the district attorney of Los Angeles. They're the ones, you know, prosecuting. It's the People of the state of California versus Mr. Shinaia. *They're the plaintiff. They're essentially suing Mr. Shinaia.* It's a criminal matter. And the vast majority of cases in California these days, it's like 70, 80 percent, I think according to Judge Meyer in Long Beach, I think she told a bunch of young kids. And I don't know if that's true or not, but it sounds accurate, a majority of these cases are criminal. *So think of in terms of a civil lawsuit, him suing him. I point to Mr. Hogue is the first him. My client, the second him. The plaintiff, or the People, have the burden of proof*, and it's very, very high. There's a reason. We're talking about someone's livelihood. We're talking about someone's life. We're talking about the well-being of Mr. Shinaia. And it's

---

5    Shinaia objects to the italicized portions of counsel's argument.

higher than a civil case. It's probably the highest standard we have in California. It is the highest standard, I'm sorry, we have in California. They have to prove every single element beyond a reasonable doubt.

(Italics added.)

### B.    *Analysis*

To establish ineffective assistance of counsel, a defendant must show that counsel's performance was both (1) deficient and (2) prejudicial. (*People v. Mai* (2013) 57 Cal.4th 986, 1009.) Attorneys should avoid drawing comparisons that risk confusing, undermining, or trivializing the reasonable doubt standard. (See *People v. Dalton* (2019) 7 Cal.5th 166, 260; *People v. Bell* (2019) 7 Cal.5th 70, 111-112.) Reviewing courts will not lightly infer the jury drew the most damaging meaning, as opposed to the least damaging meaning, from the attorney's statements. (*Bell*, at p. 111.) "Reversals for ineffective assistance of counsel during closing argument rarely occur; when they do, it is due to an argument against the client which concedes guilt, withdraws a crucial defense, or relies on an illegal defense." (*People v. Moore* (1988) 201 Cal.App.3d 51, 57.)

Shinaia's counsel was not constitutionally ineffective. To begin, the argument was not deficient. Although counsel started out by analogizing the case to a civil case by explaining there were two parties, counsel never blurred the line between civil and criminal cases when it came to the differing burdens of proof: Counsel emphasized that the People's burden of proof was "higher than a civil case," that this burden of proof is "the highest standard we have in California" and that the People had to "prove every single element beyond a reasonable doubt." What is

24

more, counsel repeatedly referred to the higher burden the People bear in a criminal case, urging the jury to ask if the People "prove[d] to [the jury] beyond a reasonable doubt"; to find Shinaia "not guilty" if it had "some doubt, reasonable doubt" about his guilt; and to "hold [the People] to the legal standard." The argument was also not prejudicial. Not only did counsel correctly refer to the higher burden of proof throughout his own argument, the trial court also instructed the jury on the People's burden of proof beyond a reasonable doubt, and repeatedly referred to that standard. Jurors are presumed to follow the court's instructions (*People v. Holt* (1997) 15 Cal.4th 619, 662), and nothing defense counsel said rebutted that presumption.

## V. Cumulative Error

Defendants contend the multiple errors they assert on appeal collectively warrant reversal. We disagree. As explained above, we find no prejudicial error at all, so there is no error to cumulate. (*People v. Jablonski* (2006) 37 Cal.4th 774, 832.)

## VI. Error With Shinaia's Sentence

Shinaia argues that the trial court erred in imposing a sentence of seven years to life for the attempted murder count rather than a term of life with the possibility of parole. As the People concede, this argument is well taken. (§ 664, subd. (a) [sentence for attempted premeditated murder is "life with the possibility of parole"]; *People v. Robinson* (2014) 232 Cal.App.4th 69, 72, fn. 3 [this term has no "minimum determinate term of seven years"]; *People v. Wong* (2018) 27 Cal.App.5th 972, 977, fn. 4 [same].) We accordingly order the judgment modified to reflect Shinaia's attempted murder sentence as life with the possibility of parole. (*Robinson*, at p. 79; see *People v. Smith* (2001) 24 Cal.4th 849, 854.)

**DISPOSITION**

As to Rodriguez, the judgment is affirmed.

As to Shinaia, the judgment is modified to reflect that the sentence for attempted murder is life with the possibility of parole. The clerk of the Superior Court is directed to prepare an amended abstract of judgment reflecting these changes and to forward a certified copy of the amended abstract to the California Department of Corrections and Rehabilitation. The judgment is otherwise affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, P.J.
HOFFSTADT


We concur:


_____, J.
MOOR


_____, J.
KIM (D.)


26